YVONNE T. RODRIGUEZ, Justice
When the trial judges of this State don their robes and ascend the bench each morning, those with criminal dockets are often confronted with defendants who are rude, disruptive, noncompliant, belligerent, and in some cases, even murderously violent. In the face of this reality, Texas trial judges shoulder another heavy burden: the burden to tame the chaos before them, impose order, and uphold the dignity of the justice system. "The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated." Illinois v. Allen , 397 U.S. 337, 343, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). When challenging defendants breach decorum and threaten to tarnish proceedings with bad behavior, we afford trial judges "sufficient discretion to meet the circumstances of each case." Id.
But discretion has its limits.
Appellant Terry Lee Morris was tried and convicted on one count of soliciting the sexual performance of a child. After the jury found enhancing factors true, Morris was sentenced to 60 years in prison. Morris does not challenge the legal sufficiency of his conviction on appeal. Instead, Morris advances four procedural complaints in his brief. One complaint in particular disturbs us.
Because the trial transcript clearly shows that the trial judge, during a heated exchanged with the defendant outside the presence of the jury, ordered his bailiff to electrocute the defendant three times with a stun belt-not for legitimate security purposes, but solely as a show of the court's power as the defendant asked the court to stop "torturing" him-we harbor grave doubts as to whether Morris' trial comported with basic constitutional mandates. As such, we have no choice but to overturn Morris' conviction and remand for a new trial.[1]
BACKGROUND
Given Morris' complaints are largely procedural and the facts largely uncontested *103 for purposes of appeal, we will keep our discussion of the factual circumstances surrounding his crime brief. Morris dated the mother of the victim, J.C., who was then fifteen. After Morris and J.C.'s mother ended their relationship, Morris began contacting J.C. online. The conversations turned sexual, and Morris solicited and received nude images of J.C. that lewdly depicted her genitals. Police seized Morris' cell phone, which contained transcripts of the electronic messages as well as lewd photographs of J.C. and Morris.
DISCUSSION
Morris complains he was harmed by four procedural errors committed by the trial court. In Issue One, Morris argues the trial court erred in its use of a stun belt. In Issue Two, Morris contends the trial court abused its discretion in denying his counsel's motion to withdraw based on a conflict of interest, as Morris had filed a lawsuit against his counsel in federal court. In Issue Three, Morris maintains that the trial court should have conducted a hearing to determine if he was competent to stand trial. Finally, in Issue Four, Morris complains that the trial court erred by failing to grant his motion to suppress, since the arrest affidavit only supported probable cause as to a search for nude images on his cell phone, not a search of non-photographic data.
We will begin and end our discussion of Morris' appellate issues with Issue One.
Issue One: Improper Use of Stun Belt
In Issue One, Morris asserts that the trial court violated his constitutional rights "to a fair trial, to confront the witnesses, to confer with counsel, to be present at trial, [and] to participate in his defense" by repeatedly shocking Morris with a stun belt for failing to answer the trial court's questions regarding compliance with decorum, all in the absence of any valid courtroom security concerns. We agree.
The judicial misconduct of which Morris complains took place on the first day of the guilt-innocence phase of trial. After the prosecutor read the indictment, trial judge George Gallagher asked Morris for his plea, which led to the following exchange in open court:
THE COURT: To this charge you may plead guilty or not guilty. What is your plea?
THE DEFENDANT: Sir, before I say that, I have the right to make a defense.
THE COURT: The-
THE DEFENDANT: It was brought to my attention by the United States district court to do this. And before the Court-for the information of the Court, yesterday you gave this man orders to put a shock rag or a shock collar on my ankle to prevent me from saying anything in my defense. If it happens, it happens. But let me just say for the record-
THE COURT: No, wait just a minute.
THE DEFENDANT:-lawsuit pending against this judge.
THE COURT: Jury, go to the jury room.
THE DEFENDANT: I have a lawsuit pending against this attorney. I've asked this judge to recuse himself off my case. It's in relation to the Ken Paxton case, Attorney General Ken Paxton. I've asked this attorney to recuse himself off my case. They both refused to. I have that right.
(Jury leaves courtroom)
Outside the presence of the jury, Morris attempted to continue his objections. The trial court warned Morris about any further outbursts. When Morris continued to speak and mentioned his motion to recuse *104 and federal lawsuit against the trial judge, the trial judge asked his bailiff to intervene by activating the stun belt attached to Morris' leg:
THE DEFENDANT: The defendant has a right to object to procedures whereby a party asserts a piece of evidence or other matters-
THE COURT: Mr. Morris. Mr. Morris. I am-
THE DEFENDANT: That's the law.
THE COURT: Mr. Morris, I am giving you one warning. You will not make any additional outbursts like that, because two things will happen. Number one, I will either remove you from the courtroom or I will use the shock belt on you.
THE DEFENDANT: All right, sir.
THE COURT: Now, are you going to follow the rules?
THE DEFENDANT: Sir, I've asked you to recuse yourself.
THE COURT: Are you going to follow the rules?
THE DEFENDANT: I have a lawsuit pending against you.
THE COURT: Hit him.
(Deputy complies)[2]
After shocking Morris the first time, the trial court again asked Morris if he would adhere to courtroom decorum:
THE COURT: Are you going to behave?
THE DEFENDANT: I'm an MHMR client.
THE COURT: Are you going to behave?
THE DEFENDANT: I have a history of mental illness.
THE COURT: Hit him again.
(Deputy complies)
Following the second shock, the trial court repeated the same question to Morris several times over Morris' protestations that he was under medication for mental health problems and that the trial court was "torturing" him. When Morris stated that he was firing his attorney, the trial court apparently took Morris' remarks as an attempt to invoke his Faretta[3] right to self-representation. The trial court began asking Morris a question ostensibly related to the Faretta invocation, but when Morris continued to speak about other matters, the trial court persisted in making use of the stun belt:
THE DEFENDANT: I have a history of mental illness. You're wrong for doing this.
THE COURT: Are you going to behave?
THE DEFENDANT: You're torturing an MHMR client. I have agoraphobia. I'm under medication.
THE COURT: Are you going-
THE DEFENDANT: I take 17 pills a day for my disability, my MHMR disability. You have no right to do this.
THE COURT: Are you going to behave?
THE DEFENDANT: I have the right-
THE COURT: You have no right to disrespect the Court.
THE DEFENDANT: I have the right. Nobody is-
THE COURT: I'm going to give you the option to do one of two things. You can either behave in the courtroom-
THE DEFENDANT: I don't have an attorney. I'm firing this man. I've told him to get off my case. And the defendant has a right to refuse counsel. I *105 have the right to represent myself in this case, and I shall.
THE COURT: All right. Let's talk about that.
Counsel may be seated.
How far did you go in school?
THE DEFENDANT: Sir, that's beside the point. There's serious allegations that I have in the United States District Court against this man. No one wants to be represented by someone they have a lawsuit against. No one wants a judge to preside over their case who the lawsuit is against. No one wants to be tortured because they're an MHMR defendant prevented from saying anything in the Court in front of the jury pertaining to any such cases such as the grand jury-
THE COURT: Mr. Morris, are you going to answer my question?
THE DEFENDANT: I've asked you, I've filed a motion asking-
THE COURT: Would you hit him again.
(Deputy complies)
THE DEFENDANT:-to recuse yourself from the Bench off my case.
After electrocuting Morris a third time, the trial court again asked Morris whether he would be obedient. When Morris did not answer with a "yes" or "no," the trial court had Morris physically removed from the courtroom:
THE COURT: Are you going to answer my questions?
THE DEFENDANT: You refuse to-
THE COURT: Are you going to answer my questions? Yes or no.
I need an answer.
THE DEFENDANT: I'm an MHMR client.
THE COURT: Put him up.
THE DEFENDANT: No, sir.
THE BAILIFF: Sir, you do not want to do this.
(Defendant leaves courtroom)
Upon Morris' removal from the courtroom, the trial court made findings that the defendant breached decorum and explained that the court's actions were intended to remedy that breach:
THE COURT: The Court will find that the defendant refused to answer the Court's questions. The Court will find that the defendant's demeanor in the presence of the jury as well as outside the presence of the jury towards counsel and towards the Court is sufficient enough to have the defendant removed from trial and he will not be present in the courtroom until he continues-until he exhibits appropriate behavior or demeanor or wishes to come back into the courtroom.
The Court will proceed without him. The Court will enter a plea of not guilty to the charges.
The trial court's actions drew no objections, either from defense counsel or the State. The trial court then called the jury back into the courtroom, and guilt-innocence proceedings commenced in Morris' absence. The State's first witness, Tarrant County Sheriff's Department Detective Melinda Clark, testified that she and other officers executed a search warrant for a cell phone at Morris' home, located in a trailer park on Lot 702. Morris opened the front door himself and was alone in the house. Sheriff's deputies found the cell phone on a nightstand beside Morris' bed. After the phone was submitted for forensic analysis, Detective Clark flew to Post, Texas, to meet with J.C. Detective Clark showed J.C. photographs and text messages found on Morris' cell phone. J.C. confirmed that some pictures were of her unclothed breasts and genitals. The cell phone also contained pictures of Morris *106 clothed and unclothed with his penis exposed. Following her interview with J.C., Detective Clark obtained an arrest warrant for Morris.
The State's second witness, Tarrant County Crime Scene Unit Investigator Jerry Brown, testified that the cell phone was seized at Lot 714, which conflicted with the State's first witness's testimony that the cell phone was seized at Lot 702. Defense counsel asked for a bench conference with the trial judge outside the presence of the witnesses and the jury to discuss the discrepancy. The State asserted that the address discrepancy in Brown's report was a typographical error. The trial court then inquired about Morris:
THE COURT: Do you want to take a break to talk to your client, see if he wants to join us?
MR. RAY: I'll ask him that.
THE COURT: While we're on this break, let's do that. Let's take five minutes and see if he wants to play.
The trial court ordered a recess. Upon returning from the recess, and outside the presence of the jury, counsel for Morris indicated that Morris did not want to re-enter the courtroom. The trial court then made remarks for the record regarding its previous use of the stun belt:
THE COURT: Before we bring the jury back in, at the break, Mr. Ray, did you have a chance to talk to Mr. Morris to see if he wanted to join us?
MR. RAY: I did, Judge. He informed me that he would like to stay where he is in the holdover.
THE COURT: All right. For purposes of the record, before we go any further, the Court would like to place into the record, when Mr. Morris began his statements in the presence of the jury and before I was able to send the jury back out, the defendant had gone from merely standing next to counsel to beginning to move to his right just a little bit towards the edge of the table and his agitation continued to increase.
Once the jury was outside the presence-once the jury was outside of the courtroom and outside the presence of the jury, the record will adequately reflect that the defendant continually refused to talk-to answer the Court's questions and his demeanor continued to escalate.
Let the record reflect that within about five feet from where the defendant was standing there is an 87-inch electronic Smart Board that weighs over 200 pounds that is readily within reach of the defendant, that had he grabbed that board, could have brought it over to the counsel table to affect the safety of the lawyers, Mr. Ray and the two prosecutors that would be siting within anywhere from three to five feet if he went the other way.
It was based on the totality of his continuing escalation and his movements that the Court ordered that the shock belt be initiated. It was done for the safety of the lawyers and all of the participants.
After a lunch break, the trial court, through the bailiff, asked Morris again if he wished to be present for proceedings. Morris did not return. Morris' counsel explained to the trial court that Morris was afraid of what would happen:
MR. RAY: I asked him if he wanted to come in court and be present. He said he didn't want to. He said he was scared. I told him he didn't have anything to be scared about. But he would have to behave, that he couldn't run his mouth to the Court, in front of the jury, or anything else. He had to *107 be quiet. That didn't change his opinion about what he wanted to do.
Morris refused to exit the holdover cell for the remainder of the day.
The victim J.C. testified third. J.C. testified that at the time she knew Morris, he knew she was still in school. She eventually became friends with Morris on Facebook. She testified Morris turned the conversations sexual, and that she eventually sent him nude images of herself while she was underage. The jury also heard from Kendall Novak, a cell phone examiner with the Tarrant County District Attorney's Office, who explained the technique of recovering text messages and data, including deleted data, from cell phones. He also read explicit text messages sent my Morris into the record. Photographic Analyst Mark Porter testified that based on a court-ordered photograph taken of Morris, he believed the photographs on the cell phone seized at Morris' house were of Morris.
After the close of the State's case, the trial court ordered Morris to appear in the courtroom outside the presence of the jury. Counsel briefly questioned Morris to confirm he did not wish to testify in his own defense. When counsel asked Morris if he would like to be present for closing arguments, Morris replied, "[n]o, sir."
During closing arguments, defense counsel argued that the State could not prove the cell phone in question belonged to Morris because the State failed to provide cell phone records to the jury. Defense counsel also directly addressed Morris' absence from the courtroom:
MR. RAY: [...] Remember the balls and strikes conversation we had yesterday? You might not like me. You might hate Terry Morris. One of you asked why he was wearing jail clothes. He can't behave. He smarted off at the judge. That's why he's not in here.
You might hate him. It's a pretty despicable offense. But in the game of balls and strikes, your oath that you all swore to was not the consideration. Is the ball over the plate or not?
...
The evidence ought to be pretty strong if it's beyond a reasonable doubt. That's the standard. You may not like Terry Morris. I don't like him. Kind of rude. Smells bad, you know. Is he guilty of this?
He might be. The question is not the answer to any of those things.
The question is, did these two lawyers from this witness chair convince 12 of you that they put three balls over the plate, three pitches over the plate? ...
At 2:40 p.m., the jury retired to deliberate. Twenty-five minutes later at 3:05 p.m., the jury returned a guilty verdict.
The punishment phase began the next day. On the first day of the punishment phase of trial, Morris was not present in the courtroom. The record contains no explanation for Morris' absence. The State opened its punishment case with testimony from Paul Rojas, Tarrant County Sheriff's Department fingerprint analyst. Rojas made a positive identification of Morris' penitentiary packet, including prior enhancing judgments. Thirteen-year-old K.W. testified that when she used to live in the same trailer park as Morris, she would do chores for money for various tenants, including Morris. K.W. testified that when she and her friend were in Morris' trailer one time washing his dog, he tried to convince them to have oral sex with him, and then pulled them both toward him, touched her friend's genitals, and tried to touch K.W.'s genitals. He also showed her a picture of his penis. Fourteen-year-old *108 A.L. was K.W.'s friend. She confirmed K.W.'s account of the events and said that Morris told her that if she told anyone, he would kill her.
During the second day of punishment proceedings, Morris was present in the courtroom. K.W.'s mother testified that after K.W. and A.L. had come back from washing Morris' dog, they told her that Morris had tried to molest them. After K.W's mother's boyfriend called the police, K.W. and A.L. were interviewed the next morning at the Alliance for Children.
Morris himself took the stand in his own defense on the second day of punishment proceedings. During his rambling testimony, largely given in narrative format, Morris described his mental health history, medications he was using, and issues he had with his neighbors, among other things. He denied ever molesting the girls or having them over to wash his dog. He maintained that the day he was accused of molesting his victims, he had been at a friend's house, and that when he returned to his own home, he saw a group of kids, including A.L. and K.W., sitting in his daughter's bedroom smoking and going through his videos and DVDs they stole from the woman next door.
The jury sentenced Morris to sixty years' in prison.
Analysis
Stun Belts: An Overview
[As] [i]f you had nine-inch nails and you tried to rip my sides out and then you put a heat lamp on me.
-A Maryland police sergeant, describing the sensation of being shocked with a stun belt during a training exercise in a 1998 interview with the Washington Post.[4]
"A stun belt, also known as a security belt, delivers a 50,000 volt electrical shock to the wearer when activated." Chavez v. Cockrell , 310 F.3d 805, 807 n.1 (5th Cir. 2002). "The stun belt offers more effective protection of courtroom security than alternative methods. Activated by the touch of a button, it can neutralize a security threat instantly and remotely." Hawkins v. Comparet-Cassani , 251 F.3d 1230, 1242 (9th Cir. 2001). While the make and model of the stun belt used on Morris is not clear from the record, descriptions of various stun belts and their effects on the human body appear scattered throughout case law and media reports. The California Supreme Court described one version manufactured by Stun-Tech, known as the Remote Electronically Activated Control Technology (REACT) belt, this way:
The type of stun belt which is used while a prisoner is in the courtroom consists of a four-inch-wide elastic band, which is worn underneath the prisoner's clothing. This band wraps around the prisoner's waist and is secured by a Velcro fastener. The belt is powered by two 9-volt batteries connected to prongs which are attached to the wearer over the left kidney region. ... 'The stun belt will deliver an eight-second, 50,000-volt electric shock if activated by a remote transmitter which is controlled by an attending officer. The shock contains enough amperage to immobilize a person temporarily and cause muscular weakness for approximately 30 to 45 minutes. The wearer is generally knocked to the ground by the shock and shakes uncontrollably. ... [T]he belt's metal prongs may even leave welts on the wearer's *109 skin requiring as long as six months to heal. An electrical jolt of this magnitude causes temporary debilitating pain and may cause some wears to suffer heartbeat irregularities or seizures.'
People v. Mar , 28 Cal.4th 1201, 124 Cal.Rptr.2d 161, 52 P.3d 95, 103 (2002).
A variation of that type of stun belt used in prisoner transport contains a visible belt and attaches to metal handcuffs worn on the wrists. Mar , 124 Cal.Rptr.2d 161, 52 P.3d at 103. Our sister court in Corpus Christi described a 50,000-volt stun belt system that was attached to a defendant's leg during a court proceeding, "essentially a leg bracelet worn between the upper calf and knee, and a harness." See Simms v. State , 127 S.W.3d 924, 928 (Tex.App.-Corpus Christi-Edinburg 2004, pet. ref'd).[5] An accompanying written notification signed by the defendant warned him that activation of the system could cause "[i]mmobilization causing you to fall to the ground[,]" the "[p]ossibility of self-defecation[,]" and the "[p]ossibility of self-urination." Id . at 928 n.4. In addition to these widely-recognized physiological effects, commentators have also raised questions about the use of the belt against people with heart problems, epilepsy, or individuals using psychotropic medications. See Shelley A. Nieto Dahlberg, Comment, The REACT Security Belt: Stunning Prisoners and Human Rights Groups Into Questioning Whether Its Use is Permissible Under the United States and Texas Constitutions , 30 ST. MARY'S L.J. 239, 251 (1998). According to media reports, one Texas corrections officer died after receiving two 45,000-volt shocks during a stun belt training exercise. While the belt manufacturer denied liability, the officer's autopsy showed he died from a cardiac arrhythmia, and the justice of the peace leading the inquest ruled that the officer died as a result of the shock. Id . at 251-52.
Apart from the physical effects, stun belts also have effects on the wearer's mind. Indeed, the psychological effects were an early selling point in support of the technology. Id . at 252. Stun-Tech REACT belts were initially marketed as giving law enforcement officials " 'total psychological supremacy ... of potentially troublesome prisoners,' " and company officials touted the devices as "act[ing] more as a deterrent rather than a means of actual punishment because of the tremendous amount of anxiety that results from wearing a belt that packs a 50,000-volt punch." Id . Federal courts have not only recognized the anxiety-inducing effects of stun belts, but have also raised concerns that the ambient anxiety associated with wearing a stun belt could potentially cause constitutional problems for defendants. As the Eleventh Circuit observed in a stun belt case, "[t]he fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely chills a defendant's inclination to make any movements during trial-including those movements necessary for effective communication with counsel." United States v. Durham , 287 F.3d 1297, 1305 (11th Cir. 2002).
Beyond anxiety, stun belts may affect the brain in other ways. While the neurological effects of stun belts have not been extensively researched, at least one recent study showed that when a stun belt is used to actually administer an electric shock, the stun belt wearer's cognitive abilities can be adversely, if temporarily, affected. See Robert J. Kane and Michael D. White, TASER® Exposure and Cognitive Impairment: Implications for Valid Miranda Waivers and the Timing of Police Custodial Interrogations , 15 CRIMINOL
*110 OGY & PUB. POL'Y 79-107 (Feb. 2016).[6] In this study, healthy, mostly college student participants aged eighteen to thirty-four who received one five-second shock from a TASER suffered from mild cognitive impairment in the areas of verbal learning and memory commensurate with the "mean level of cognitive functioning for 79-year-old nondemented adults ...." The cognitive effects lasted up to an hour. Id . at 21. Participants also reported "significant negative change in several subjective state self-measures, including concentration difficulty, anxiety level, and feeling overwhelmed." Id . at 20. Researchers theorized that if electric shocks of that nature could affect young, healthy participants' cognition to that extent, electric shocks from TASER-type devices would lead to even greater impairment for subjects "who may be drunk, high, or mentally ill and in crisis at the time of exposure[.]" Id . at 22.
A. Court Reaction to Stun Belts
The use of stun belts on criminal defendants has proven controversial throughout the years, and the Indiana Supreme Court has banned their use in courtrooms outright. See Wrinkles v. State , 749 N.E.2d 1179, 1194-95 (Ind. 2001) (finding that other restraints "can do the job without inflicting the mental anguish that results from simply wearing the stun belt and the physical pain that results if the belt is activated"). But most courts across the United States generally agree that there are certain circumstances in which their use may be justified. A trial court's use of a stun belt to maintain courtroom security under certain circumstances is nearly universally accepted as appropriate. Indeed, courts have observed that placing a defendant in a stun belt likely prejudices the defendant less in the eyes of the jury than having the defendant appear in shackles, as many stun belts-worn under clothing-are virtually invisible to jurors. See Taylor v. State , 279 S.W.3d 818, 821 (Tex.App.-Eastland 2008, pet. ref'd).
In Texas, before even being able to place a stun belt as a restraint on a defendant, the trial court must hold a hearing and establish that the use of the restraint is necessary. Simms v. State , 127 S.W.3d 924, 928 (Tex.App.-Corpus Christi-Edinburg 2004, pet. ref'd) ; see also United States v. Moore , 651 F.3d 30, 45 (D.C. Cir. 2011) (detailing 11-factor test federal courts use to determine if it is necessary to outfit a defendant with a stun belt). However, our sister court in Texarkana has found that if a defendant never objects on the record to being forced to wear the stun belt, he waives his right to review of the trial court's restraint decision, meaning that the trial court's failure to hold a hearing or make security findings cannot form the basis for appellate reversal. Jackson v. State , No. 06-14-00097-CR, 2015 WL 2376319, *2-*4 (Tex.App.-Texarkana Sept. 16, 2015, pet. ref'd) (mem. op., not designated for publication), cert. denied --- U.S. ----, 136 S.Ct. 1188, 194 L.Ed.2d 202 (2016).
B. Stun Belts as a Decorum-Enforcement Method
Whether a trial court can use a stun belt to enforce courtroom decorum through the use of electric shocks is largely an open question. Near as we can tell, only one court in the country-the United States Court of Appeals for the Ninth Circuit-has ever directly addressed a judge's use of a stun belt to enforce decorum in the absence of any legitimate security concerns.
*111 See Hawkins , 251 F.3d at 1230. In Hawkins , a state judge ordered her bailiff to shock an unruly pro se defendant who repeatedly spoke out of turn and interrupted her. The defendant later filed a civil rights action against the judge and others, which led a federal district court to enjoin the use of stun belts at all in state courtroom proceedings in Los Angeles County. The Ninth Circuit found that the preliminary injunction was overbroad in that it prevented the legitimate use of the belt to maintain security, i.e. to prevent violence or an inmate's escape. See id . at 1242-43. However, the Ninth Circuit also found that the trial court did not abuse its discretion by enjoining the belt's use for purposes other than security. Id .
It is at the precipice of this important debate between decorum and security where this Court sits in the case at bar. While this issue has apparently arisen at least once before in a Texas courtroom,[7] at least at the present time, this case presents an apparent issue of first impression. No case deals with the precise situation at bar: that is, a challenge to the propriety of the trial court's actual use of the stun belt to administer electric shocks as a way to enforce decorum.[8]
*112 Given the lack of state-specific case law on this point, given the persuasive rationales advanced by out-of-jurisdiction courts, and given the trial court's extreme and outrageous conduct here, we hold that decorum concerns alone are not enough to justify shocking a defendant multiple times, even outside the presence of the jury.
Constitutional Framework
The briefing from the State and Morris make clear that this case implicates two separate constitutional concerns: a defendant's right to be free from restraints during trial, and a defendant's right to be present at trial. Those rights touch on separate provisions of the federal constitution. We discuss them in turn.
The Due Process Clause of the Fifth Amendment secures a defendant's right to a fair trial. United States v. Moore , 651 F.3d 30, 45 (D.C. Cir. 2011). The United States Supreme Court has found that certain trial practices prejudice criminal defendants' right to a fair trial when those practices offend one of three "fundamental legal principles:" (1) the presumption that a defendant "is innocent until proven guilty;" (2) the right to consult with counsel to "secure a meaningful defense;" and (3) the principle that "judges must seek to maintain a judicial process that is a dignified process." Id . (citing Deck v. Missouri , 544 U.S. 622, 630-31, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005) ). "When a government practice is prejudicial because it either inherently or in a particular defendant's case offends these principles, the Court has forbidden district courts from utilizing the practice unless it is justified by an essential state interest, such as courtroom security or escape prevention, specific to the defendant on trial." Id . Placing visible restraints on a defendant offends the presumption of innocence, as it may prejudice the defendant in the eyes of a jury and make them believe he or she is already guilty of a crime. Id . Absent an essential state interest such as courtroom safety, the placement of shackles or other visible restraints on a criminal defendant during trial is constitutionally impermissible. Id .[9]
*113 The Sixth Amendment's Confrontation Clause protects a cluster of rights for criminal defendants, including the right to be present at every stage of trial. Illinois v. Allen , 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970).[10]
Preservation of Error
Before reaching the merits, we have procedural matters to address. The State opens its defense of Morris' conviction by arguing that this Court is powerless to address the trial court's actions in using the stun belt at all. Why? The State asserts that any error the trial court made in shocking Morris three times for his disobedience and disrespect of the trial court was waived by Morris' failure to object, both at the time he was fitted for the stun belt and each time the trial court electrocuted him.
The State does concede that Morris made the comments "You're torturing an MHMR client" and "You have no right to do this," which could arguably be construed as objections. Nevertheless, the State insists that these protestations were insufficient to preserve error-Morris was represented by counsel, who never objected to the trial court's electrocution orders, and the trial court was free to disregard Morris' "pro se objection" unless "(1) the objection is adopted by counsel, (2) the trial court permits a hybrid representation situation, either as to the particular objection or in general, or (3) the trial court denies the pro se objection on the merits." Fleck v. State , Nos. 01-09-00983-CR, 01-11-00271-CR, 01-11-00272-CR, 2011 WL 1632168, at *4 (Tex.App.-Houston [1st Dist.] Apr. 28, 2011, pet. ref'd) (mem. op., not designated for publication). Because counsel never objected to the shocks, because the trial court never permitted Morris to represent himself with counsel in hybrid representation, and because the trial court never substantively ruled on the merits of Morris' objections, in the State's eyes, error was not preserved. And even if Morris' statements could be taken as valid legal objections, the State argues that they were "meaningless general objection[s]" that would not direct the trial court's attention to whatever specific issue needed to be corrected.
The State's arguments on Morris' objections or lack thereof beg a more fundamental question: was Morris even required to object to his own electrocution under these circumstances?
The answer is no.
1. Was Morris Required to Object?
Generally speaking, before an appellate court may address an issue on appeal, the error must have been preserved in the trial court. At its core, the concept of error preservation is simple: "The complaining party must let the trial judge know what she wants and why she thinks she is entitled to it, and do so clearly enough for the judge to understand and at a time when the trial court is in a position *114 to do something about it." Bekendam v. State , 441 S.W.3d 295, 300 (Tex.Crim.App. 2014). Requiring a party to object gives "the trial court or the opposing party the opportunity to correct the error or remove the basis for the objection." Id . at 299. TEX.R.APP.P. 33.1 governs the form and procedure of trial court objections. In brief, Rule 33.1 requires the complaining party to lodge an objection and obtain a ruling, either explicit or implicit, as a prerequisite to appellate review. Id .
However, Rule 33.1 does not apply to all errors in a criminal case. Appellate courts may review some errors in a criminal case even in the absence of a trial-level objection. In Marin v. State , the Texas Court of Criminal Appeals identified three categories of rights relevant to an appellate court's preservation analysis: "(1) absolute requirements and prohibitions; (2) rights of litigants which must be implemented by the system unless expressly waived; and (3) rights of litigants which are to be implemented upon request." Marin v. State , 851 S.W.2d 275, 279 (Tex.Crim.App. 1993). The Texas Court of Criminal Appeals then stated that the Texas law of procedural default "only applies to the last category" of errors. Id . In other words, the mandates of Rule 33.1 (i.e. objection and a ruling from the trial court as a prerequisite to appellate review) only apply in cases that involve Marin Category-3 rights that must be implemented upon the objector's request. Id . Category-1 and Category-2 errors may be addressed on appeal regardless of whether a trial-level objection is made. Id . Recently, the Texas Court of Criminal Appeals reaffirmed Marin 's categorical approach to error preservation while also rejecting a harm-based theory of error preservation, finding that the issue of whether trial court preservation is a prerequisite to appellate review hinges on the type of error presented, not on how much harm the error caused. See Proenza v. State , 541 S.W.3d 786, 795-97, 2017 WL 5483135, at *6-*7 (Tex.Crim.App. Nov. 15, 2017). Thus, even errors causing egregious harm in a trial can be waived if they involve so-called "forfeitable rights" under the Marin framework. Id .
The question here is whether the error Morris complains of falls into Category 3 under Marin . If so, a trial-level objection and ruling were required under Rule 33.1.
We agree with the State that Morris was required to object to the trial court outfitting him with a stun belt at the outset of trial in order to preserve any improper restraint points on appeal. The law on that point is clear: a defendant who fails to object waives any complaint that the trial court made him wear an unnecessary restraint like a stun belt. Jackson , 2015 WL 2376319 at *2-*4.
Where we part ways with the State is on whether Morris needed to object to the trial court's separate action of actually administering electric shocks in order to obtain appellate review as to the propriety of the trial court's actions. The State says Morris also needed to object at that point to preserve error for appellate review. We disagree.
"If a category of error by its very utterance tends to threaten the integrity of the criminal adjudicatory process itself, we may, consistent with Marin , deem it proper for appellate courts to at least consider the merits of these claims-even in the absence of a trial-level objection-and take corrective measures as appropriate." Proenza , 541 S.W.3d at 798, 2017 WL 5483135, at *8. We believe that a judge's use of electric shocks against a defendant-particularly when those shocks do not appear to serve legitimate security purposes, but were done to coerce answers *115 out of the defendant-is the type of error that "tends to threaten the integrity of the criminal adjudicatory process itself." Id. The potentially incapacitating effects of a 50,000-volt electrical shock from a stun belt can affect a defendant's ability to consult with counsel, participate in his own defense, or even be present, conscious, and mentally able to make decisions at trial. See State v. Belcher , 183 S.W.3d 443, 450 (Tex.App.-Houston [14th Dist.] 2005, no pet.) (affirming trial court's grant of a motion for new trial because accidental discharge of stun belt violated defendant's right to be present for every stage of trial by incapacitating him during voir dire).[11] We are further bolstered in our conclusion that no objection was necessary for appellate review by the fact that case law characterizes the right to be present at trial as a right that must be implemented but that can be waived through conduct. That, to us, sounds like a Category-2 right under the Marin framework, i.e. a right that must be implemented absent a knowing, intelligent, and voluntary waiver. And because only Category-3 errors are subject to the strictures of Rule 33.1, Morris was not required to object in order to obtain review of his right-to-be-present claim. Accord Hayes v. State , 516 S.W.3d 649, 655 (Tex.App.-Houston [1st Dist.] 2017, pet. ref'd) (the right to be present cannot be forfeited by counsel's failure to object); Kessel v. State , 161 S.W.3d 40, 44 n.1 (Tex.App.-Houston [14th Dist.] 2004, pet. ref'd).
Preservation does not stand as an obstacle to our review of the trial court's actions on the merits.
Did the Trial Court Abuse Its Discretion by Using the Stun Belt to Maintain Courtroom Decorum, Rather than For Legitimate Security Purposes?
Having found that the absence-from-trial error is properly within our purview, we turn to the merits of Morris' claim. In assessing whether the trial court erred by shocking Morris, we divide our analysis here into two parts. We first address whether Texas trial courts may use stun belts to enforce decorum-and answer "no" to that question. We then address whether the trial court's post hoc oral statements that it administered the shocks for security purposes stands up to scrutiny.
Matter of First Impression: Trial Courts Cannot Use Stun Belts to Enforce Decorum
We must subject courtroom security practices that "pose such a threat to *116 the 'fairness of the factfinding process' " to "close judicial scrutiny." Holbrook v. Flynn , 475 U.S. 560, 568, 106 S.Ct. 1340, 1345, 89 L.Ed.2d 525 (1986). Due process prohibits the use of physical restraints on a defendant at trial in most circumstances. The trial court retains the discretion to use such restraints, but before we can bless the trial court's decision as being constitutionally sound, we must assure ourselves that such restraint or security practice is justified by an "essential state policy," "such as physical security, escape prevention, or courtroom decorum" that is specific to the defendant on trial. Id. ; see also Deck , 544 U.S. at 628, 125 S.Ct. at 2012.
The United States Supreme Court first took up the issue of balancing a defendant's Sixth Amendment confrontation right to be physically present in the courtroom against the trial court's power to enforce the essential state interests of decorum and order in Illinois v. Allen . In that case, the defendant Allen, on trial for robbery, insisted on representing himself in court. 397 U.S. at 339, 90 S.Ct. at 1058-59. The trial court permitted Allen to represent himself in a hybrid representation scenario with appointed standby counsel. Id . When the trial judge interrupted Allen during voir dire and asked him to keep his questioning of a particular juror on-topic, Allen "argue[d] with the judge in a most abusive and disrespectful manner." Id . at 339, 90 S.Ct. at 1059. When the judge allowed Allen to continue questioning the juror, Allen threatened to turn the judge into a "corpse." Id . at 340, 90 S.Ct. at 1059. The judge warned Allen against any further outbursts, but Allen continued to behave disruptively, so the judge had him removed. The judge offered to let Allen return to trial if he promised to behave, but Allen initially refused, and he was brought out only for purposes of identification. Later, Allen agreed to return to the courtroom and behave, and he was present for the remainder of trial. Id . at 340-41, 90 S.Ct. at 1059-60.
The Illinois Supreme Court reversed Allen's conviction, holding that the trial court erred by excluding the defendant from the courtroom and thereby violating his right to be present for trial, which was absolutely and inviolable. Id . at 341-42, 90 S.Ct. at 1059-60. The United States Supreme Court, in turn, reversed the Illinois Supreme Court, holding both that a defendant could lose the right to be present from trial after disregarding a warning from the trial judge, and that the trial court's actions were an appropriate exercise of discretion in maintaining order. Id . at 342-43, 90 S.Ct. at 1060-61.
Allen identified at least three constitutionally permissible ways the trial court could have dealt with the defendant. The trial court, after a warning, could properly exclude the defendant from the courtroom until the defendant agreed to behave properly. Id . at 344, 90 S.Ct. at 1061. The trial court could also cite the defendant for contempt, though the Supreme Court observed that a mere citation might be an ineffective deterrent in some circumstances and that exclusion may still ultimately be necessary. Id . at 344-45, 90 S.Ct. at 1061-62. Finally, the Allen court also approved of binding and gagging as a method of dealing with a contumacious defendant while still keeping him in the courtroom. Id . at 344, 90 S.Ct. at 1061. However, the Court also expressed grave reservations about when such a course of conduct should be implemented, opining such a remedy should be used only "as a last resort" because: (1) seeing the shackles and gags "might have a significant effect on the jury's feelings about the defendant;" (2) gagging would reduce the defendant's ability to communicate with counsel; and (3) the technique approached "an affront to the very dignity and decorum *117 of judicial proceedings that the judge is seeking to uphold." Id .[12]
Significantly, Allen did not hold that those three methods were the only means by which a trial court could deal with a disruptive defendant. Other security arrangements may satisfy constitutional concerns. See , e.g. , Holbrook v. Flynn , 475 U.S. 560, 569, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986) (placing four uniformed officers in front row of the courtroom galley behind the bar during defendant's trial was not inherently prejudicial). Still, while Allen left open the possibility that there may be other methods by which a trial court can deal with an obstreperous defendant, no American court has ever held that a judge may use a stun belt as a disciplinary device against a non-dangerous defendant. This Court will not be the first to do so.
As other courts have recognized, the mere outfitting of a defendant of a stun belt must be necessitated by legitimate courtroom security or risk of flight concerns-and even then, it must only be used as a last resort. See, e.g., Moore , 651 F.3d at 46 (recognizing that placement of a stun belt on a defendant without adequate justification is unconstitutional and analyzing trial court's necessity determination using 11-factor framework); Hymon v. State , 121 Nev. 200, 111 P.3d 1092, 1098 (2005) (a defendant "should not be restrained" with a stun belt "except as a last resort"); Weaver v. State , 894 So.2d 178, 195 (Fla. 2004) ("A stun belt's potential for prejudice must be measured against other alternative forms of restraint and whether these alternatives are less prejudicial or viable."). We fail to see how the circumstances justifying an actual discharge of a stun belt could fall outside the threshold legal strictures placed on the device when it is simply being worn by a defendant in court. If anything, the deployment of a security belt should theoretically happen less frequently and under more urgent circumstances than those requiring the placement of the belt in the first place. Common sense and experience seem to bear this out. As the paucity of Texas-specific case law shows, the use of a stun belt to actually electrocute a defendant is rare, indeed. As so it should be. Only once has the discharge of a stun belt ever been mentioned in appellate opinions. The discharge was accidental; the court of appeal affirmed the trial court's new trial grant based on the discharge, finding that although physically present, the electric shock violated his right to be present by *118 incapacitating him. Belcher , 183 S.W.3d at 450.
In Deck , the Supreme Court observed that "[j]udicial hostility to shackling may once primarily have reflected concern for the suffering-the 'torture' and 'torments'-that 'very painful' chains could cause." 544 U.S. at 630, 125 S.Ct. at 2012-13. Indeed, the ancient English common law rule underpinning the Supreme Court's restraint jurisprudence was largely a recognition of the significant pain a defendant would endure while wearing the leg irons and manacles of the day; the rule against restraints at trial "ensured that a defendant was not so distracted by physical pain during his trial that he could not defend himself." Id . at 638, 125 S.Ct. at 2017 (Thomas, J., dissenting). And while the high court's jurisprudence has moved away from "stress[ing] the need to prevent physical suffering (for not all modern physical restraints are painful)[,]" we cannot ignore this common law concern over the effects of physical pain on the defendant in our analysis here. Id. at 630, 125 S.Ct. at 2012-13. Never before have we seen any behavior like this, nor do we hope to ever see such behavior again. As the circumstances of this case perfectly illustrate, the potential for abuse in the absence of an explicit prohibition on non-security use of stun belts exists and must be deterred. We must speak out against it, lest we allow practices like these to affront the very dignity of the proceedings we seek to protect and lead our courts to drift from justice into barbarism.
We hold that stun belts may be actually deployed only in extraordinary circumstances when immediate security concerns or flight risk justify use. We further hold that the use of stun belts for other purposes, such as a method to enforce decorum or as a punishment for a defendant's obstreperous conduct, is constitutionally prohibited and falls outside the wide discretionary penumbra for courtroom management set by Allen .
The Record Shows the Trial Court Impermissibly Used the Stun Belt to Enforce Decorum, Not For a Legitimate Security Purpose
Having held that only valid security concerns can justify the activation of a stun belt, we next turn to the question of whether the trial court here, in fact, used the stun belt to address valid security concerns. We note that the State never explicitly argues that the trial court had the inherent authority to discipline Morris for his outbursts by using the stun belt. Rather, in defense of the trial court's actions, the State directs our attention to the trial court's post hoc explanation of its actions in shocking Morris as being driven primarily by security concerns for the court and trial counsel. The State candidly admits that "[t]he trial court's comments when shocking Appellant ... would be troubling had the trial court not explain[ed] in the passage quoted above what was happening when the shocks were ordered[,]" but it nevertheless urges us to defer to the trial court's explanation without inquiry, particularly given that the explanation drew no on-the-record objection from Morris' counsel.
While we as an appellate court owe due deference to the trial judge's findings, we need not defer to findings that find no support in the record, nor are we entitled to defer to a trial judge's incorrect legal conclusion. See State v. Weaver, 349 S.W.3d 521, 526 (Tex.Crim.App. 2011) (noting, in suppression context, that trial courts are entitled to almost total deference in fact findings only if findings are supported by the record and that applications of facts to law are reviewed de novo ). Here, the record clearly shows the judge *119 engaged in a pattern of calculated conduct aimed not at security or even maintaining decorum, but rather at demonstrating his power over the defendant. The judge repeatedly asked the defendant "[a]re you going to behave?" and if Morris was "going to answer my question?" He then ordered the sheriff's deputy to "hit him" "again" and "again" when the defendant gave answers other than the word "yes." Immediately after having Morris removed, the trial court also made specific oral findings that Morris refused to answer any questions and explained that its actions were undertaken in response to Morris' obstreperous conduct. We also cannot ignore the fact that the trial judge, at Morris' arraignment, had previously threatened Morris with the use of a stun belt, again in a context devoid of apparent security concerns. The stun belt issue first arose during a discussion of whether Morris wished to appear in court wearing regular clothes or prison clothes:
[Trial court concludes discussion in which defendant, in response to a question as to whether the defendant wanted punishment to be tried by the jury or the court, refused to provide an answer. The trial court took defendant's "standing mute" as a request for the Court to assess punishment. Trial counsel assented.]
MR. RAY: We have one other thing before we get to the Motion to Suppress. I'd asked Mr. Morris before we started, I was asking his clothes sizes so I could get him some clothes, and he indicated to me that he didn't want to have me get any clothes for him. I'd just like the Court to address that with him. If he wants to wear jail clothes, it's all right with me if that's what he wants to do, but I think he needs to be admonished of the consequences of that.
THE COURT: Okay. When we come into court and the jury comes in, the law says that you have an absolute right not to have to appear in jail clothes. Okay? That you can be dressed as if you were not in jail, that you are out on bond. That way the jury does not know that you're in jail. Okay? That's why Mr. Ray was trying to find out what size clothes you wear, so he could bring you clothes to wear in the presence of the jury. If you don't want to wear civilian clothes, if you want to wear your jail clothes, you have that right to do that too. So my question is, do you want to be tried in front of the jury wearing your jail clothes, or do you want to let Mr. Ray bring you some civilian clothes in to wear in front of the jury so that the jury would not know that you are in jail?
THE DEFENDANT: Actually, I'd like to recant on that, if you don't mind, sir.
THE COURT: I'm sorry?
THE DEFENDANT: Go ahead and let the jury decide, please.
MR. RAY: You want the jury to set your punishment?
THE DEFENDANT: Yes.
THE COURT: All right. So are you saying you do or you do not want to wear jail clothes?
THE DEFENDANT: Doesn't matter to me, sir.
THE COURT: Well, the law is I have to have you wear civilian clothes unless you tell me no.
THE DEFENDANT: I don't know what to say really. I really don't know. I-
THE COURT: All right. Well here's what we'll do. Here's what we'll do-
THE DEFENDANT: -stand here with this guy.
*120 THE COURT: Here's what we'll do next week. We need to get the sheriff involved, we will get a shock belt and we'll put- we're going to put a shock monitor on your leg. Okay? Because then if you don't behave and do what the bailiffs ask you to do, then we can shock you to where we put you down on the ground and we'll forcibly put clothes on you. So I don't want to do that. That's why I'm asking you. Do you want to just tell me right upfront, do you want to agree to wear the clothes or not wear the clothes? Because otherwise, I'm going to have to do some extraordinary methods. I'm going to have to do some extraordinary things to make sure that I comply with the law. So-
THE DEFENDANT: Do I have to wear them?
THE COURT: You don't have to if you don't want to.
THE DEFENDANT: I don't want to.
THE COURT: All right. That's very good. That's very good. Then we'll let you appear in your jail clothes.
THE DEFENDANT: Great.
We are mindful of our duty to defer to the trial court's reasonable use of discretion in maintaining order, but the trial court must have predicate security grounds before the exercise of that discretion is warranted. Here, the trial court's delayed attempts to backpedal its rationale for electrocuting Morris by raising security grounds as an explanation for its actions after Morris refused to appear for trial will not bar us from finding error. The record is clear, and it speaks for itself. The trial court opened criminal proceedings by threatening, at the arraignment, to use the stun belt against Morris to force him to appear in civilian clothing if Morris did not decide if he wanted to appear in civilian clothing or prison clothing for trial. Later, the trial court electrocuted Morris three times, each time after Morris did not directly answer the question of whether he would "behave." Between the second and the third shock, the trial court asked counsel for both sides to please be seated, and attempted to engage Morris in a colloquy regarding his right to self-representation, which undercuts the trial court's pretextual statement about security concerns. This course of conduct, coupled with the trial court's post-shock remark to defense counsel about seeing if Morris wanted to come back to the courtroom and "play," evinces the trial court's erroneous belief that it could use the stun belt not as a last-resort security measure, but as a tool to force compliance with courtroom protocol and decorum.
Assuming that the trial court's description of the courtroom was correct, and that Morris was within reaching distance of a large television-type screen, there is no evidence in the record that the trial court contemporaneously perceived Morris to be a threat for that reason. In fact, the only findings the trial court made after Morris was removed from the courtroom dealt with Morris' disruptive verbal behavior. In light of those contemporaneous oral finding, the trial court's later findings become even less convincing. Rather than providing cover for the trial court's actions, the trial court's belated "security" explanation-which took place after two witnesses had already testified and the defendant refused to return to courtroom-only bolsters our conclusion that the trial court's actions were, in fact, punitive and aimed at rectifying perceived disrespect. Such use of the stun belt is impermissible. The trial court, realizing its error too late, attempted to salvage the proceedings by offering a pretextual explanation of its previous actions. That pretextual explanation finds no footing in the record before us.
*121 The trial court abused its discretion, exceeded its authority, and violated Morris' constitutional rights by deliberately shocking him three times in the absence of any valid security concerns. Cf. Belcher , 183 S.W.3d at 450 (holding that accidental discharge of stun belt violated defendant's right to be present for every stage of trial by incapacitating him during voir dire).
Morris' Absence from the Trial Was Not Voluntary
Finally, we address the State's contention that error in this case was, in essence, invited. The State asserts that Morris waived his right to be present by engaging in misconduct before the trial court, thereby provoking the trial court to physically remove him. As for Morris' subsequent absence from the courtroom, the State maintains that the trial court invited him to rejoin the proceedings several times. Morris refused. Thus, because Morris voluntarily absented himself from the proceedings even though the trial court provided Morris with the opportunity to return, the fault for Morris' absence lies with Morris and not the trial court-and Morris cannot benefit on appeal from the consequences of his own actions.
"[A] defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." Allen , 397 U.S. at 343, 90 S.Ct. at 1060-61. "Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." Id . The defendant's voluntary absence from trial does not create grounds for reversal. "After commencement of trial proceedings, a defendant may voluntarily absent himself from the trial without a violation of his Sixth Amendment right to be present during all phases of the trial." Ashley v. State , 404 S.W.3d 672, 680 (Tex.App.-El Paso 2013, no pet.). "This is because the Supreme Court has recognized that a defendant's conduct in voluntarily absenting himself after his trial has commenced with him in attendance amounts to a forfeiture of his Sixth Amendment right to be present during the time he is absent." Id .
We agree with the State that the trial court was within its power to order Morris removed from the courtroom for his conduct; disrespect of the court, talking out of turn, and disrupting proceedings are recognized as valid reasons to exclude a defendant from proceedings (and had that been the only thing the trial court did in the lead up to Morris' removal, this case would be an easy affirmance). The trial court also did ostensibly offer to let Morris return to the courtroom several times. Morris declined to re-enter the courtroom. The State insists that the trial court's offer to let Morris back into the proceedings satisfied any constitutional obligations under Allen , and that after the trial court extended the offer, Morris voluntarily waived the right to be present by refusing to re-enter the courtroom.
The matter is not so simple.
We cannot, as the State suggests, view the actions of the trial court in a vacuum. The nature and severity of the trial court's actions prior to Morris' removal proximately caused Morris' constructive exclusion from the courtroom by instilling in him a reasonable fear of arbitrary and capricious electrocution. The State directs our attention to cases showing that absences resulting from the defendant's own conduct, such as suicide attempts and self-intoxication, *122 cannot form the basis for a valid absence claim. Smith v. State , 494 S.W.3d 243, 254 (Tex. App.-Texarkana 2015, no pet.). But Smith is distinguishable-it involves the consequences of a defendant's voluntary self-inflicted act. While Morris' conduct may have been the originating cause that justified his removal from the courtroom, the intervening and superseding cause of Morris' failure to return to the courtroom was not the result of his own action, but rather, the actions of the trial court in electrocuting him three times with 50,000-volt shocks before having him removed from the courtroom.
The State also cites several out-of-state cases in which courts found that a defendant's absence from the courtroom due to concerns about the stun belt were voluntary absences. See State v. Lehr , 227 Ariz. 140, 254 P.3d 379, 384 (2011) ; Wallace v. Lawler , No. CIV.A. 09-345, 2010 WL 2105102 (E.D.Penn. Mar. 25 2010). But even as persuasive authority, those cases are inapplicable. In Lehr , a defendant repeatedly told the trial judge that he wanted to waive his right to be present from any court proceedings, and "[t]he trial court held lengthy discussions to confirm that Lehr understood his right to be present and that he knowingly, intelligently, and voluntarily waived that right." 254 P.3d at 384. Only on the eve of the penalty phase did the defendant voice concerns about wearing the stun belt, instead asking to appear "dressed in jail clothes and wearing chains." Id . at 385. The Supreme Court of Arizona did not credit Lehr's protestations about the stun belt as the real reason he stayed out of the courtroom, and the Court speculated that had Lehr requested the trial court not place him in the belt, the trial court would have held a security hearing establishing its necessity, thereby obviating any error. Id . at 385. Lehr does not deal with the actual deployment of a stun belt, nor is it even clear that fear of the stun belt played any role in the defendant's decision-making from the record before the Arizona court. And in Wallace , a federal magistrate judge sitting on habeas review declined to address the defendant's absence claim at all, determining that an applicant who claimed that the mere wearing of a stun belt created psychological barriers that prevented him from consulting with counsel had forfeited any associated Sixth Amendment violation claim under federal habeas law. 2010 WL 2105102, at *6.
As a fallback, the State also attacks Morris' argument that he was afraid, as the trial court's transcript show his counsel only referencing a general claim of fear but not specifically stating why Morris would be afraid to come back to the courtroom. "In the absence of any evidence to the contrary, the court should engage in the presumption that the trial court finding regarding the voluntariness of appellant's absence is correct." Aguirre v. State , 695 S.W.2d 793, 794 (Tex.App.-San Antonio 1985, no pet.). We note that the trial court never actually made any finding that Morris' absence was voluntary, but in any event, there is evidence refuting any presumption that Morris' absence was voluntary. We think it was clear from the context why Morris was afraid to return to the courtroom. Such fear prompted by the trial court's egregious conduct rendered Morris' refusal to re-enter the courtroom an involuntary absence.
Error is clear from this record. The trial court violated Morris' Sixth Amendment right to be present for trial by inflicting unjustifiable physical pain on Morris, thereby causing him to refuse to re-enter the courtroom for the entirety of the guilt-innocence phase and a substantial portion of the punishment phase of trial. Cf.
*123 Belcher , 183 S.W.3d at 450 (accidental discharge of stun belt violated defendant's right to be present by incapacitating him).
Was Morris Legally Harmed by the Trial Court's Error?
The trial court's actions, without a doubt, caused Morris physical harm. Having found that the trial court erred, the operative question for us on appeal is whether Morris suffered a legal harm from that error sufficient to warrant reversal of his conviction in its entirety.
Again, because we write without the benefit of similar Texas cases to guide us, the harm standard we must employ here is unclear. Morris urges to adopt a per se harm standard that would require automatic reversal of any conviction involving a defendant who was improperly shocked while wearing a stun belt, maintaining that there is "widespread rejection of the use of this device as an implement of torture." The State, by contrast, argues that we must apply the harmless error review standard set out in TEX.R.APP.P. 44.2(a) -that is, we must reverse the conviction unless we determine "beyond a reasonable doubt that the error did not contribute to the conviction or punishment." This is the standard used when a defendant is wrongfully tried in absentia or otherwise excluded from the courtroom. See Jasper v. State , 61 S.W.3d 413, 422-23 (Tex.Crim.App. 2001).
We agree with the State that, under the harm standards promulgated by the Texas Court of Criminal Appeals, we must review this error for harmlessness beyond a reasonable doubt.
What Harm Standard Must We Use?
We employ a three-tiered approach to assessing harm. The level of harm necessary to warrant appellate reversal depends on which conceptual category the error fits.
The first category of errors are known as structural errors. "A structural error affects the framework within which the trial proceeds, rather than simply an error in the trial process itself[.]" [Internal quotation marks, citation, and alterations omitted]. Schmutz v. State , 440 S.W.3d 29, 35 (Tex.Crim.App. 2014). If an error is structural, no harm analysis is required; the mere existence of the error so undermines the criminal justice process that automatic reversal of a conviction is warranted. Id . While the Texas Court of Criminal Appeals is split as to whether only certain federal constitutional errors specifically identified as "structural" by the United States Supreme Court are the only types of errors that are subject to automatic reversal,[13] those errors specifically acknowledged as structural include: (1) the total deprivation of counsel at trial; (2) lack of an impartial trial judge; (3) the unlawful exclusion of members of the defendant's race from a grand jury; (4) the denial of the right to self-representation at trial; (5) the denial of the right to a public trial; and (6) an instruction that erroneously lowers the burden of proof for conviction below the "beyond a reasonable doubt" standard. See Johnson v. State , 169 S.W.3d 223, 235 (Tex.Crim.App. 2005) (citing Johnson v. United States , 520 U.S. 461, 468-469, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) ).
The remaining types of errors, described in case law simply as "trial errors," are subject to the harm standards set out in *124 TEX.R.APP.P. 44.2. Non-structural constitutional trial errors are subject to harmless error review, meaning that they require reversal unless the reviewing court believes beyond a reasonable doubt that the error did not contribute to the defendant's conviction. TEX.R.APP.P. 44.2(a).
All other non-structural, non-constitutional "error[s], defect[s], irregularit[ies], or variance[s]" must be disregarded unless they affect "substantial rights." TEX.R.APP.P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." King v. State , 953 S.W.2d 266, 271 (Tex.Crim.App. 1997). A substantial right is not affected " 'if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.' " Solomon v. State , 49 S.W.3d 356, 365 (Tex.Crim.App. 2001).
While we are inclined to agree that the use of non-security-related electric shocks to the point that the defendant fears a return to the courtroom certainly sounds like a structural error that affects the framework in which a trial proceeds, we also recognize that a majority of the Texas Court of Criminal Appeals has not yet decided that TEX.R.APP.P. 44.2(a) permits intermediate appellate courts to decide that structural errors beyond those explicitly identified by the United States Supreme Court exist. Because the United States Supreme Court has not yet spoken on the subject of stun belts, and because we find ourselves unable to "declare certain classes of federal constitutional violations to be so detrimental to the conduct of a fair trial as to be immune to harm analysis before the Supreme Court has spoken on the subject[,]" Lake v. State , 532 S.W.3d 408, 419 (Tex.Crim.App. 2017) (Yeary, J., concurring), we have no choice but to apply the non-structural constitutional harm standard under TEX.R.APP.P. 44.2(a).
Still, under that standard, we find that reversal is warranted in this case.
The Trial Court's Error Was Not Harmless Beyond a Reasonable Doubt
We head into our constitutional harmless error analysis presuming that reversal is required. See TEX.R.APP.P. 44.2(a). We may only affirm Morris' conviction if we are convinced, beyond a reasonable doubt, that the trial court's error had no effect on the jury's verdict. Id. "Because Rule 44.2(a) requires reversal unless harmlessness is shown, it effectively places the burden on the State to show that the error is harmless." Sanford v. State , 21 S.W.3d 337, 345 (Tex.App.-El Paso 2000, no pet.), abrogated on other grounds in Motilla v. State , 78 S.W.3d 352, 357 (Tex.Crim.App. 2002). "If, after such analysis, the harm of the error simply cannot be assessed, then 'the error will not be proven harmless beyond a reasonable doubt,' " and reversal is required. Lake , 532 S.W.3d at 411.
Factors that courts may consider in assessing harm under Rule 44.2(a) include the nature of the error, whether it was emphasized by the State, the probable implications of the error, and the weight the jury would likely have assigned to the error. Snowden v. State , 353 S.W.3d 815, 822 (Tex.Crim.App. 2011).[14] However, these factors are not exclusive, nor are all *125 these factors necessarily applicable to each type of constitutional error. "There is no set formula for conducting a harm analysis that necessarily applies across the board, to every case and every type of constitutional error." Id . at. 822 n.31.
Applying these standards, we are not convinced that the error did not contribute to Morris' conviction or punishment.
The State advances a two-pronged theory of harmlessness. The main thrust of the State's harm argument is that the trial court's actions could not have prejudiced Morris since the shocks did not take place in the presence of the jury. We hesitate to endorse the State's rationale outright. While we understand that the harmless-error inquiry is not "intended to satisfy any punitive, deterrent, or remedial purpose[,]" that the potential for errors like this to continue in future cases plays no part in our decision to overturn a verdict, and that we "should adhere strictly to the question of whether the error committed in a particular case contributed to the verdict obtained in that case [,]" [emphasis in original] Snowden , 353 S.W.3d at 821, it would be highly problematic for us to suggest that constitutional violations such as this one that happen behind closed doors outside the presence of the jury are beyond our reach. But more to the point, the State's main argument is incorrect. The trial court's actions, though undertaken outside the presence of the jury, did prejudice Morris in the jury's eyes; those actions directly led to Morris' absence from trial.
In Morrison v. State , 480 S.W.3d 647 (Tex.App.-El Paso 2015, no pet.), this Court analyzed a violation of the right to be present under the harmless beyond a reasonable doubt standard. In that case, the defendant had an outburst during voir dire, which led to a mistrial and a new jury panel the next day. Id . at 651. When the defendant had a second outburst, the trial court placed the defendant in a holdover cell for the remainder of trial. Id. The holdover cell had a speaker so that the defendant could hear everything that was going on during trial. Id . The Court ultimately affirmed the defendant's conviction on the basis that "for all practical purposes, defense counsel's arguments left the jury with only two choice, to either convict Appellant of the greater offense of capital murder or the lesser offense of murder[,]" and "[b]ecause the jury chose the lesser of these two offenses, as requested by defense counsel, it is difficult to conclude that Appellant was harmed by virtually any error that may have occurred at his trial." Id . at 665.
Nevertheless, the Court also made it clear that had it not been for the success of defense counsel's aim-for-the-lesser-offense strategy, the defendant would have suffered serious harm from being absent from the majority of trial. Id . at 664-65. In contrasting that defendant's situation from other cases in which our sister courts found that brief absences from trial were harmless, we held that the exclusion from the majority of trial "limited Appellant's ability to assist counsel with virtually any portion of his defense[,]" and "we agree[d] with Appellant that the jury could have drawn a negative inference from the fact that the trial court permanently excluded Appellant from his entire trial after only witnessing a single and relatively short outburst." Id . at 664. "Given the extreme nature of the trial court's decision to immediately banish Appellant from the courtroom based on that incident, the jury may have speculated that Appellant had previously engaged in much more egregious, and perhaps even violent, conduct to warrant that decision." Id . at 664.
*126 Here, Morris' absence through the entirety of the guilt-innocence phase and through large parts of the punishment phase was the direct result of the trial court's conduct. While the trial court shocked Morris outside the presence of the jury, the trial court's actions were so pervasive they effectively caused his absence. That abrupt absence following an outburst from Morris certainly could have weighed on the jury's mind in rendering its verdict.
The second prong of the State's harmlessness argument is somewhat stronger, but still unavailing. The State asks us, if we find the trial court erred in shocking Morris, to find the error was harmless beyond a reasonable doubt and affirm Morris' conviction based on "the utter hopelessness of Appellant's case and the lack of anything that could be contributed by Appellant's presence at the guilt stage[.]" It is true that the State's evidence against Morris was strong, and that "the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error" under Rule 44.2(a). Motilla , 78 S.W.3d at 357. We are also deeply hesitant to overturn a guilty verdict when even Morris himself does not contest legal sufficiency, particularly in a case involving a sex crime and a minor. Indeed, Morris' only defense at trial was that the State could not prove the cell phone was his without accompanying cell phone records-this even though police seized the phone from his trailer; even though the phone contained numerous sexually explicit text messages sent to the victim, as well as photographs of his face, genitals, and living quarters; and even though the victim herself testified that Morris had asked her to perform sexually for him. We cannot argue with the State that Morris' defense, in light of the evidence as a whole, rings somewhat hollow.
Even so, as we noted in Morrison , the defendant's absence from trial is not a trivial factor in the jury's decision-making process. On the contrary, it is palpable and its impact cannot readily be assessed-and as such, under Lake , we must assume it had some effect. In cases such as this one, even if the defendant does not testify, his demeanor will play a role in the jury's determination of guilt and innocence.
Given Rule 44.2(a)'s presumption in favor of reversal, given the importance of the right that was violated and the pervasive manner in which it was violated, and given the intangible effect that Morris' absence may have had on the jury, we cannot say beyond a reasonable doubt that this error was harmless. Because the error occurred during the guilt-innocence phase, Rule 44.2(a) requires us to reverse Morris' conviction in its entirety, both as to guilt and punishment.
Summary
We close by stating the obvious: this case represents an extreme, idiosyncratic fact pattern. While the trial court's frustration with an obstreperous defendant is understandable, the judge's disproportionate response is not. We do not believe that trial judges can use stun belts to enforce decorum. A stun belt is a device meant to ensure physical safety; it is not an operant conditioning collar meant to punish a defendant until he obeys a judge's whim. This Court cannot sit idly by and say nothing when a judge turns a court of law into a Skinner Box, electrocuting a defendant until he provides the judge with behavior he likes. Such conduct has no place in this State's courts.
We have no choice but to reverse. Issue One is sustained.
*127 CONCLUSION
We reverse and remand for a new trial based on the trial court's improper use of the stun belt. Because Morris' remaining issues, if meritorious, would at most entitle him only to that relief which he has already received (reversal and remand for a new trial), we decline to address Issues Two, Three, and Four as unnecessary to the resolution of this appeal. TEX.R.APP.P. 47.1.

We hear this case on transfer from the Second Court of Appeals in Fort Worth and apply Second Court precedent to the extent required by Tex.R.App.P. 41.3.

The parties all agree that the judge's instruction to the deputy to "hit him" were an instruction to activate the stun belt.

Faretta v. California , 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed. 2d 562 (1975).

Katherine Shaver, New Tool in Courts: Stun Belts , The Wash. Post , Dec. 29, 1998, https://www.washingtonpost.com/archive/local/1998/12/29/new-tool-in-courts-stun-belts/215cfcdf-732b-49bb-b9be-3f9620b9684b

Morris described his stun belt as a "shock rag" or "shock collar on my ankle."

Paper available online at http://arstechnica.com/wp-content/uploads/2016/02/taserpaper.pdf.

See Lisa Bose McDermott, Questions raised after shock belt used at Texas murder trial , Reuters (Sept. 26, 2015), https://www.reuters.com/article/us-usa-texas-judge/questions-raised-after-shock-belt-used-at-texas-murder-trial-idUSKCN0RQ0C720150926 (media reporting that trial judge used shock belt against pro se capital murder defendant in response to misbehavior). The case is pending before the Texas Court of Criminal Appeals as Calvert v. State , AP-77,063.

A Westlaw search reveals that Texas appellate courts have only mentioned the use of stun belts in eleven cases, none of which appear to involve the actual use of the device to intentionally administer electric shocks to a defendant. The subject matter of those cases breaks down as follows:
• Two cases involve short, unpublished habeas corpus orders from the Texas Court of Criminal Appeals granting remands for fact-finding hearings where counsel's failure to object to the stun belt was listed as one of many allegations of ineffective assistance. See Ex parte Perez , No. WR-75,547-01, 2011 WL 4072416 (Tex.Crim.App. S ept. 14, 2011)(not designated for publication)(noting allegation, among others, that "trial court ordered that he [habeas applicant] wear a stun belt during trial" and remanding to the trial court for a factual hearing on ineffective assistance of counsel); Ex parte Moore , No. WR-43,490-04, 2011 WL 2376526 (Tex.Crim.App. June 8, 2011) (not designated for publication)(noting allegation of counsel's failure to object to having applicant wear stun belt at trial among other allegations of ineffective assistance of counsel and remanding to trial court for hearing on allegations).
• Three cases found that defendants suffered no harm from merely being outfitted with a stun belt, given that it was not actually used and that the jury likely never knew about its presence. Taylor v. State , 279 S.W.3d 818, 821 (Tex.App.-Eastland 2008, pet. ref'd) ; Grant v. State , 255 S.W.3d 642, 649-50 (Tex.App.-Beaumont 2007, no pet.) (pro se defendant suffered no harm from imposition of leg irons and stun belt when restraints were not visible by jury); Simms , 127 S.W.3d at 928-29.
• One case addressed the presence of a stun belt-again, never used-as a visible restraint on the defendant during trial, finding that the defendant waived any appellate arguments about the stun belt placements by failing to object. See Jackson v. State , No. 06-14-00097-CR, 2015 WL 2376319, *2-*4 (Tex.App.-Texarkana Sept. 16, 2015, pet. ref'd) (mem. op., not designated for publication), cert. denied --- U.S. ----, 136 S.Ct. 1188, 194 L.Ed.2d 202 (2016) (error waived where defendant failed to object after presence of stun belt was revealed to the jury when trial court ordered defendant to remove shirt and expose tattoos so expert could verify gang membership).
• One case deals with the effect of an accidental discharge of the stun belt that resulted in a new trial grant that was upheld on appeal. State v. Belcher , 183 S.W.3d 443, 449-50 (Tex.App.-Houston [14th Dist.] 2005, no pet.) (upholding the trial court's new trial grant where the accidental discharge of a stun belt incapacitated the defendant and prevented him from conferring with counsel about peremptory juror strikes in voir dire).
• One case out of this Court mentions in passing that a defendant had complained about wearing a stun belt during voir dire; the stun belt was removed. Morrison v. State , 480 S.W.3d 647, 655 (Tex.App.-El Paso 2015, no pet.). In a similar case, a trial judge conducting a competency to stand trial hearing after the defendant attempted suicide briefly mentioned that the sheriff's department had suggested the defendant wear a stun belt, but that the judge would have it taken off unless there were "any problems." Graves v. State , No. 02-15-00141-CR, 2015 WL 9244767, at *4 (Tex.App.-Fort Worth Dec. 17, 2015, pet. ref'd) (mem. op., not designated for publication). Another case simply noted that a defendant was fitted with visible shackles pending the arrival of a stun belt in court the next day. Cox v. State , No. 14-15-00684-CR, 2017 WL 716606 (Tex.App.-Houston [14th Dist.] Feb. 23, 2017, pet. ref'd) (mem. op.).
• One case involved an extremely violent murder defendant who complained on appeal about being forced to wear visible shackles before a jury, and suggested that the trial court erred by not putting him in a stun belt instead, which would have not been visible. Keith v. State , 294 S.W.3d 352, 355 (Tex.App.-Eastland 2009, no pet.).

We also note that the Fourteenth Amendment due process clause also includes a right to bodily integrity as a fundamental substantive due process right, particularly with respect to the use of excessive force by state actors. Washington v. Glucksberg , 521 U.S. 702, 720, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997) ; Fleming v. State , 455 S.W.3d 577, 590 (Tex.Crim.App. 2014) (Keller, P.J., dissenting). Because Morris has not briefed that aspect of due process, and because the judgment is reversible on other grounds, we decline to address that aspect of due process as it may or may not apply here.

Morris also cites Eighth Amendment case law. To the extent Morris raises an Eighth Amendment claim in response to the use of the shock belt, we find the Eighth Amendment inapplicable. The Eighth Amendment's ban on cruel and unusual punishment only applies after conviction. At the time the trial court used the stun belt against Morris, Morris had not yet been convicted of a crime. See United State v. Myers , 972 F.2d 1566, 1571 (11th Cir. 1992) (police use of stun gun during arrest did not give rise to an Eighth Amendment cruel and unusual punishment claim).

In support of its contention that Morris was required to object to the activation of the stun belt to preserve error, the State cites United States v. Moore , a federal case from the District of Columbia Circuit Court of Appeals. In Moore , the defendant moved for a new trial based on the activation of the stun belt outside the presence of the jury, and the trial court denied his motion. But Moore does not contain a discussion of preservation of error. 651 F.3d at 47-48. Rather, the Moore court found the trial court committed "no error" by continuing to hold trial, given that the defendant was examined by a nurse and found to be physically fine, and the defendant agreed to continue on with trial. Id . at 48. Because Moore did not hold that a defendant was required to object in order to present an error before the D.C. Circuit, we find it unpersuasive and inapplicable in our preservation analysis.
The State also points to Harris v. State , No. 74025, 2003 WL 1793023, at *3 (Tex.Crim.App. Feb. 12, 2003) (not designated for publication), for the proposition that a defendant's right to be present is waived if his counsel proceeds with trial and does not object to his own client's absence. That Court of Criminal Appeals opinion has been designated as "unpublished." "Unpublished opinions have no precedential value and must not be cited as authority by counsel or by a court." Tex.R.App.P. 77.3.

Allen and the cases handed down in its wake are not perfect analogues to this situation. As the State readily seizes on in its brief, these cases largely discuss the use of visible restraints in the presence of the jury , while this case involves the deployment of an otherwise invisible restraint outside the presence of the jury. Still, we find Allen 's precepts instructive on how to measure a trial court's exercise of discretion in security situations. The concerns posed by restraints do not extend only to the jury's perception of the defendant. "We are more concerned about the possibility that a stun belt could disrupt a different set of a defendant's constitutionally guaranteed rights[,]" namely, the Sixth Amendment right to confer with counsel and the "Sixth Amendment and due process rights to be present at trial and to participate in his defense." Durham , 287 F.3d at 1305-06. As the Supreme Court noted in Deck , three overriding legal precept drive the Court's jurisprudence in this area: first, the need to preserve the presumption of innocence in the eyes of the jury; second, the preserving the defendant's right to present a defense by being able to communicate with his counsel; and third, the need "to maintain a judicial process that is a dignified process ... which includes the respectful treatment of defendants[.]" 544 U.S. at 630-31, 125 S.Ct. at 2012-13. Because Allen is not limited solely to those cases in which a defendant claims prejudice in the eyes of the jury, we will apply Allen 's balancing test here. Accord Durham , 287 F.3d at 1305-06.

See Lake v. State , 532 S.W.3d 408, 411 (Tex.Crim.App. 2017) (Keller, P.J., plurality op.)(only those errors identified by the U.S. Supreme Court can be structural); id . at 419 (Yeary, J., concurring)( Tex. R.App.P. 44.2(a)'s language may be elastic enough to embrace other types of errors as structural).

The Texas Court of Criminal Appeals specifically repudiated "the source of the error" and "whether declaring the error harmless would encourage the State to repeat it with impunity" as factors to be considered in the harm analysis. Snowden v. State , 353 S.W.3d 815, 820 (Tex.Crim.App. 2011).