IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 15, 2020 Session

## STATE OF TENNESSEE v. KEVIN BRAZELTON

**Appeal from the Criminal Court for Knox County**
**No. 107785   Bobby R. McGee, Judge**

_____

### No. E2019-00992-CCA-R3-CD

_____

A Knox County Criminal Court Jury convicted the Appellant, Kevin Brazelton, of four counts of aggravated robbery, a Class B felony.  After a sentencing hearing, the trial court sentenced him to twenty-five years for each conviction and merged the convictions.  On appeal, the Appellant contends that the trial court should have granted a mistrial when a court officer shocked him with a stun belt in the jury's presence; that the trial court erred by allowing the prosecution to use a peremptory challenge against the only African-American member of the venire in violation of Batson v. Kentucky, 476 U.S. 79, 89 (1986); and that the trial court erred by instructing the jury on "flight."  Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Gerald L. Gulley, Jr. (on appeal), and Susan E. Shipley (at trial), Knoxville, Tennessee, for the appellant, Kevin Brazelton.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta Kisha Monette Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

In April 2016, the Knox County Grand Jury indicted the Appellant for four counts of aggravated robbery based on alternative theories.  The Appellant went to trial in April 2018.

At trial, Mary Jo Jones testified that on the night of April 14, 2016, Valentine's Day, she was working alone at the KenJo Market on Rutledge Pike. Shortly after 9:00 p.m., she was texting on her cellular telephone and heard someone enter the store. When she looked up to greet the customer, she saw a man with a gun. The man told her to "give him the money," but Jones told the man that she "couldn't just open the register." The man came behind the counter and again told her to "get the register money out." Jones entered a code, the register "popped open," and the man took the money out of the register. He demanded more money and wanted Jones to open the safe, but she was unable to so. The man ran out of the store, and Jones called 911.

Jones testified that she was "really shocked" when she first saw the man but that she "started getting scared" when he came behind the counter. She said that he approached her "two or three times with his gun raised" and that he "got very close to [her] face with that gun." She described the gun as "a big rifle thing" and said he "actually held it like he would pull it back and stuff." She stated that the incident occurred toward the end of her shift and, therefore, that she "didn't barely have over $100" in the cash register. On cross-examination, Jones testified that the man was in the store for at least two minutes.

Officer Adam Parnell of the Knoxville Police Department (KPD) testified that he responded to Jones's robbery call and spoke with her. Jones described the suspect as an African-American male, six feet tall, and having dreadlocks. He was wearing a red, white, and blue bandana; tan pants; and a "beanie cap." A witness reported seeing a brown van leaving the scene near the KenJo. According to the witness, a white female was driving the van and an unknown male was the passenger. Officer Parnell broadcast the suspect's description and the information about the brown van over the police radio.

Officer Parnell testified that the manager of the KenJo arrived and played the store's video surveillance for police officers. The video showed the suspect "rushing into the store with . . . what appeared to [be an] AR platform rifle." The video also showed that the suspect was wearing gloves. On cross-examination, Officer Parnell testified that Jones said the suspect was wearing a mask over his face but that she estimated he was in his "early 30s."

Martin Patel, the General Manager of the Red Roof Inn near Cedar Bluff Road, identified a registration card for room 113. The card showed that on February 14, 2016, someone used a Tennessee identification card in the name of Jaumani Dunn to rent the room and paid $72.56 in cash.

Officer Phillip Jinks of the KPD testified that on the night of February 14, 2016, he heard about the Kenjo Market robbery over his police radio. He stopped a brown van in

the area, and "pretty quickly" determined that the people in the van were not involved. Officer Jinks later responded to a "shots-fired" call from room 113 at the Red Roof Inn near Cedar Bluff Road. Officer Jinks went to the Kroger at the intersection of Kingtson Pike and Cedar Bluff and observed the Appellant in custody. The Appellant was wearing brown pants, a gray zip-up hoodie, and a red and white bandana. The Appellant had a "taser barb" from a police taser in his lip and another taser barb in his right thigh. Officer Jinks went to the Red Roof Inn and noticed a black Audi parked in front of room 113.

Officer Jinks testified that he searched the Audi and found a Seattle Seahawks toboggan with a "ball" on top and "a replica-type AR-15 rifle" in the trunk. He said that the gun was "like a battery-powered electric air-soft rifle" but that it looked like "a real AR-15." Officer Jinks also found a cellular telephone, a wallet containing a Tennessee identification card in the name of Jaumani Dunn, a pair of gloves, and a digital scale in the car. Officer Jinks found money "wadded up" inside the center console. The money included twenty-three one-dollar bills and totaled sixty-eight dollars. On cross-examination, Officer Jinks acknowledged that the Audi belonged to a drug dealer named Tonjai Hardy.

Officer Jacob Wilson of the KPD testified that on February 15, 2016, he went inside the Kroger at the intersection of Kingston Pike and Cedar Bluff and saw the Appellant. He told the Appellant to stop, but the Appellant fled on foot. Officer Wilson acknowledged that he ended up "tasing" the Appellant and that he took the Appellant into custody. On cross-examination, Officer Wilson testified that he never saw the Appellant near the black Audi at the Red Roof Inn. He estimated that the Red Roof Inn was less than one-eighth of a mile from Kroger.

Officer Rollin McGowan of the KPD testified that on February 15, 2016, he responded to a shots-fired call at a room at the Red Roof Inn near Cedar Bluff Road. When he arrived, he saw a woman inside the room. Officer McGowan went to the door of the room and noticed a dark-colored Audi parked in front of the room. Officer McGowan spoke with the woman and looked outside for evidence. He did not find any bullet casings or bullet holes.

On cross-examination, Officer McGowan testified that the woman was African-American. Officer MGowan issued information about an African-American male and a white male as active shooters. He never saw the Appellant near the Audi.

Officer Jeff Day of the KPD testified that he responded to the robbery at the KenJo Market and watched the surveillance video. About two minutes before the robbery, cameras inside the store recorded a vehicle that appeared to be a black Audi outside the

store. Officer Day later prepared a search warrant for the Appellant's cellular telephone, which was found in the black Audi parked at the Red Roof Inn.

Investigator Andrew Olson of the KPD testified that he analyzed the Appellant's cellular telephone. The telephone showed that on February 14, 2016, the Appellant "missed" incoming calls from 7:50 p.m. to 9:20 p.m.

During its case-in-chief, the State played the video of the robbery for the jury and introduced the video into evidence. The State also introduced into evidence photographs taken of the Appellant when he was arrested at Kroger in the early morning hours of February 15, 2016; photographs of the Seattle Seahawks toboggan and the gun that police found in the trunk of the black Audi; and photographs of the Appellant that were in his cellular telephone and were taken on the afternoon of February 14, 2016. The photographs showed that the clothing the Appellant was wearing before and after the robbery matched the clothing the suspect was wearing in the video. Moreover, the Seattle Seahawks toboggan that was found in the trunk of the Audi matched the toboggan that the suspect was wearing in the video, and the gun that was found in the trunk of the Audi matched the gun that the suspect was carrying in the video.

Shirley Davidson, the Appellant's aunt, testified for the Appellant that about 7:30 p.m. on February 14, 2016, the Appellant came to her house in the Mechanicsville community. They talked and watched episodes of Family Feud, and the Appellant left about 9:10 p.m. On cross-examination, Davidson testified that her sister and another nephew also were present. She said she did not remember what the Appellant was wearing that night or how he got to her home. The Appellant did not have his baby daughter with him.

Lieutenant Aaron Turner testified on rebuttal for the State that he was the keeper of records for the Knox County Sheriff's Office and identified a jailhouse telephone call made by the Appellant on February 16, 2016. During the call, which the State played for the jury, the Appellant told a woman he referred to as "momma" that he and someone named "Quay" were at the brewery "around" the time of the robbery. The Appellant also said his daughter was with him "the whole night." Investigator Olson was recalled to the stand and testified on rebuttal for the State that at 7:45 p.m. on February 14, 2016, a text message was received on the Appellant's cellular telephone that read, "What you guys doing[?]" A response was sent from the Appellant's telephone at 7:46 p.m. that read, "Eating spaghetti we at [Fazzoli's] down west."

At the conclusion of the proof, the jury convicted the Appellant of all four counts of aggravated robbery, a Class B felony, as charged in the indictment. After a sentencing

hearing, the trial court sentenced him to twenty-five years for each conviction with release eligibility after service of eighty-five percent and merged the convictions.

## A.  Mistrial

The Appellant contends that the trial court erred by refusing to grant his request for a mistrial after a court officer shocked him with a stun belt in the jury's presence.  The State argues that the trial court properly denied the Appellant's request for a mistrial.  We agree with the State.

Soon after the State indicted the Appellant, the trial court appointed first trial counsel to represent him.  In January 2017, the trial court granted first trial counsel's motion to withdraw, appointed second trial counsel, and set the Appellant's trial for May 1, 2017.  The technical record reflects that the trial court reset the Appellant's trial numerous times but ultimately scheduled his trial for August 14, 2017.

On the day the trial was supposed to begin, the Appellant advised the trial court that he had filed a complaint against second trial counsel with the Board of Professional Responsibility.  The Appellant told the trial court that "[t]his woman has not once came to see me to prepare a defense" and that "this woman is not effective."  The trial court responded that "[w]e've been through all that," but the Appellant continued to complain about second trial counsel.  The trial court repeatedly ordered the Appellant to stop talking, but the Appellant continued to interrupt the trial court.  Finally, the following exchange occurred:

> DEFENDANT BRAZELTON:  Man, [f***] her.
>
> THE COURT:  Mr. Brazelton.
>
> DEFENDANT BRAZELTON:  [F***] her.
>
> THE COURT:  Mr. Brazelton.
>
> DEFENDANT BRAZELTON:  [F***] you, too.
>
> THE COURT:  Mr. Brazelton --
>
> DEFENDANT BRAZELTON:  [F***] all y'all.
>
> DEFENDANT'S MOTHER:  Kevin.

THE COURT: -- I'm ordering you to stop talking.

DEFENDANT BRAZELTON: [F***] that, man.

DEFENDANT'S MOTHER: Please, Kevin.

THE COURT: For the fifth time --

DEFENDANT BRAZELTON: What the [f***] y'all want to do, we can do it.

THE COURT: -- I'm ordering you to stop talking.

DEFENDANT'S MOTHER: Kevin, please.

DEFENDANT BRAZELTON: Sitting there like -- what's up?

The trial court ordered that the Appellant be taken "into the dock." As he was being escorted out of the courtroom, the Appellant stated, "[F***] you, too. . . . [B]ogus-[a**] lawyer, can't even represent me. [S***]. Bull[s***], man." Even after the Appellant was removed from the courtroom, the trial transcript reflects that he could be heard repeatedly saying, "[F***]."

The State requested that the Appellant be "equipped with a shock belt" under his clothing so that he could be present in the courtroom for trial. The trial court agreed that the Appellant needed to be present and asked if second trial counsel had anything to say about the matter. Second trial counsel responded that the Appellant had "called [her] every name in the book," that his mother also had made "some kind of threats against" her, and that the Appellant was "upset" with her because she did not visit him over the weekend. Second trial counsel said, "I had no intention of doing that after the way that he had talked to me. I was not going to, you know, subject that -- subject myself to that." Second trial counsel stated that she was "ready to go forward" and that "[w]hatever the Court wants to do is fine with me."

The trial court asked that the court officer check on the Appellant to make sure that the Appellant was not hurting himself, and the officer reported that the Appellant was "just walking in circles." The trial court stated that it did not think the Appellant was going to calm down so that he could return to the courtroom and noted that the Appellant had a history of filing complaints against his attorneys "right before trial." The trial court found that the Appellant was "acting in a way to deliberately obstruct the trial." At that point, the Appellant could be heard saying, "[F***] it all. [F***] y'all."

The trial court then considered the State's request that the Appellant wear a stun belt and addressed the concerns raised in Mobley v. State, 397 S.W.3d 70 (Tenn. 2013). The trial court noted that pursuant to Mobley, it was required "to employ the least drastic security measures" and that it was required to consider whether a stun belt was necessary to maintain a dignified judicial process. The trial court found that the jury would be unaware of the stun belt because it would be under the Appellant's clothes and that "with him screaming out the F bomb over and over, there's not much dignity of process at all here." The trial court also considered whether the stun belt was necessary to prevent escape, protect those present in the courtroom, and maintain order. The trial court found that "it is clear that in this case, the defendant is not going to allow the Court to maintain order without the imposition of additional security." The trial court noted that the Appellant's outburst was "at least the second time he's acted out in this fashion, . . . so there is a repetition."

The trial court also noted that a psychological evaluation had never been performed on the Appellant. Second trial counsel advised the trial court that the Appellant's juvenile file showed he had "some history of some issues with impulse control" and "suffered from either ADHD or ADD." The State advised the trial court that a violation of probation had been filed against the Appellant in a previous case and that the person who filed the violation "put something in the record about . . . his anger issues." The trial court ordered that the Appellant receive a psychological evaluation to determine whether he was competent to stand trial and stated, "If he does have some sort of psychological disorder that can be treated with medication and that will keep us from having to dress him up like a hog to try him, I would much prefer to go in that direction." Pending the evaluation, the trial court continued the Appellant's trial to November 7, 2017.

On October 25, 2017, second trial counsel filed a motion to withdraw. The trial court granted the motion on October 30, 2017. On November 20, 2017, the trial court appointed third trial counsel to represent the Appellant. The Appellant finally went to trial on April 24 and 25, 2018.

On the first day of trial, before the Appellant was brought into the courtroom and before jury selection, the trial court stated on the record that the Appellant was evaluated at Helen Ross McNabb and that he was found competent to stand trial. The trial court informed the parties that the court was going to "give him a chance to sit here with no belt, no shackles, no nothing for his entire trial, if he'll just behave." The trial court then stated as follows:

> All right. I'm going to have him brought in. He wants to address the
> Court. And I'm sure he's going to tell me he's got a lawyer coming and he

wants it reset; he don't want to go to trial today, which is what he always says. And unless -- if a lawyer comes forward right now ready to try the case today, then there's going to be no reset.

If he starts going off at that point, I'll have him taken into the holding cell and we'll have the belt installed. And I'll bring him back out and try to talk to him and try to convince him to be calm and to help his lawyer conduct the trial. If he continues to go off and scream and everything, at that point, I will have him stunned. The jury won't be in here, but he will know what it feels like. And, hopefully, that will calm him down enough. If he still keeps going off, then I'll probably put him in the cell and turn the [closed circuit] TV on. That's the best we can do.

The State asked if the sheriff's department had explained the stun belt to the Appellant, and a court officer responded, "No, we have not. But we will before that happens."

When the Appellant was brought into the courtroom, he told the trial court that his relationship with third trial counsel was "horrible" and that "I can't even talk to this lady about my trial and what I have going, as far as how I want my trial to be fought." The trial court told the Appellant that "[w]e're going to conduct your trial today, period," and the Appellant requested to represent himself. The trial court denied the request, stating, "It's too late for that. We've been through all that. You're represented by counsel. She knows what she's doing. She can conduct the trial." The Appellant stated that he wanted to "fire this lawyer." The trial court said the Appellant was obstructing the trial and warned the Appellant, "If you don't stop, you're going to be taken back into the holding cell . . . [a]nd we're going to put a stun belt on you. . . . If you continue to do what you're doing . . . you will be stunned." The Appellant continued to argue with and talk over the trial court. The trial court found that the Appellant was making it impossible to try his case and ordered that the deputies take him into the holding cell and "put the stun belt on him." The Appellant repeatedly told the deputies, "Don't put your hands on me." Nevertheless, the Appellant was taken out of the courtroom. When he returned, the trial court stated, "Let the record show that the stun belt has been placed on Mr. Brazelton. Mr. Brazelton has come back into the courtroom and so far is remaining quiet and is behaving himself. As long as he continues to do that, he will not be hurt."

The Appellant did not cause any disruptions during the State's case-in-chief. However, after the Appellant's aunt, Shirley Davidson, testified on his behalf, the following occurred:

THE COURT: Anything on redirect?

[THIRD TRIAL COUNSEL]:  No, Your Honor.

THE COURT:  [Ms. Davidson's] excused.

[THIRD TRIAL COUNSEL]:  Thank you, sir.

(Defendant was hit with stun belt.)

COURT OFFICER:  When I say, "sit," that means sit down.

DEFENDANT BRAZELTON:  All right, Cuz.  I just want to make sure my grandmother get out the door.  I ain't causing no problem.

THE COURT:  All right.

[THIRD TRIAL COUNSEL]:  Your Honor, may we approach?

THE COURT:  Yes.

DEFENDANT'S MOTHER:  What in the world?

DEFENDANT BRAZELTON:  I was just making sure Nanny get out the door, Momma.  I get shocked for no reason.

THE COURT:  Let's take the jury out.

DEFENDANT BRAZELTON:  I was just making sure she get out the door.  I was just making sure she get out the door.  I ain't going nowhere.  I'm just showing respect for my grandmomma.  You know, she's sick.

(Jury left the courtroom.)

THE COURT:  All right.

. . . .

DEFENDANT BRAZELTON:  I didn't say nothing.  I didn't say nothing.

Third trial counsel moved for a mistrial because the court officer shocked the Appellant in front of the jury, which made the case "too prejudicial" to continue.  The State

- 9 -

opposed a mistrial and argued that the trial court could instruct the jury to "disregard that." The trial court stated as follows:

> What -- the Court understands what he was doing was simply honoring his grandmother to standing as she exited. However, he was not given permission to do that by the Court. He is supposed to remain seated as the witnesses come and go. No one gave him permission to stand. He's under close scrutiny by the deputy because of the outbursts and the problems we've had in the past. And the deputy was under orders that if he failed to obey the deputy's orders, the deputy was to use the stun device. And that's what happened. So nobody's done anything wrong. If we could have avoided it, I certainly would have, but . . .

> This Court cannot find manifest [necessity]. I will break for 10 or 15 minutes, let Mr. Brazelton compose himself. And then if you have a curative instruction you want me to give, I will.

Third trial counsel requested a curative instruction. When the jury returned to the courtroom, the trial court instructed the jury as follows:

> I'm going to make just one brief comment and then give you one very brief instruction. What happened earlier in the courtroom has absolutely nothing to do with the merits of this case. It is in no way connected to the evidence or anything that happened at a Kenjo Market or anything that happened at a Kroger store. Just -- the matters involving courtroom security are not matters for you to be concerned with, so just put it out of your mind. It has nothing to do with the determination of whether the defendant is guilty or not guilty of anything. So just put that out of your mind and we will proceed.

The Appellant raised this issue in his motion for new trial. At the hearing on the motion, third trial counsel asserted that the court officer "issued an 80,000 volt electrical shock to Mr. Brazelton in front of the jury" when the Appellant "briefly stood up" as his elderly aunt was leaving the courtroom. Third trial counsel described the incident as "a very startling and, frankly, horrifying event for everybody in the courtroom." She noted that after the incident, the trial court "did not make any observations that Mr. Brazelton was otherwise attempting to flee, that he was otherwise attempting to disrupt the proceedings and, certainly, made no observations that he was trying to threaten anyone at the time that shock was administered." Third trial counsel acknowledged that the Appellant did not have the right to stand up but asserted that it was impermissible to shock him in order to "maintain decorum" or to punish him. The State argued that the court

- 10 -

officer ordered the Appellant to sit down and that the Appellant did not do so. The State contended that given the Appellant's previous conduct and defiance of the court officer's order to sit down, the court officer was justified in shocking him because he posed a security threat. The State noted that third trial counsel requested a curative instruction, that the trial court instructed the jury to disregard the incident, and that the jury was presumed to have followed the instruction.

The trial court stated that it heard the court officer tell the Appellant to sit down twice, that the Appellant defied the court officer, and that the court officer was "under orders . . . to make sure the defendant absolutely obeyed the instructions or use the stun belt." The trial court found that the Appellant's refusal to sit down "support[ed] the officer's concern that the defendant was beginning to act aggressively and in defiance, and he was, therefore, becoming -- posing a threat in the courtroom." The trial court further found that every effort was made not to use the stun belt but that, under the circumstances, the court officer's use of the stun belt was not improper. The court stated that the Appellant's being shocked was "unfortunate" but that "it was the fault of the defendant that it did happen." Regarding prejudice, the trial court noted that "[t]here was no apparent emotional reaction" from the jury after the incident and denied the Appellant's motion for new trial. On appeal, the Appellant contends that his being "electrocuted" in front of the jury, when he did not present a security risk and was "simply trying to honor his elderly relative," was improper to maintain "courtroom decorum" and warranted a mistrial.[1]

A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion absent clear abuse appearing on the face of the record. See State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998). Moreover, the burden of establishing the necessity for a mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Although the Appellant does not claim that the trial court erred by ordering that he wear the stun belt, a brief review of Mobley is in order. In that case, our supreme court set

---

[1] During oral arguments, appellate counsel again asserted that the Appellant was "electrocuted." However, Merriam-Webster defines "electrocute" as "to kill or severely injure by electric shock." Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/electrocute (last visited Dec. 9, 2021). While we do not intend to minimize the seriousness of shocking a defendant with a stun device, whether in or out of the jury's presence, the record does not show that the Appellant was "electrocuted."

forth the principles governing the use of stun belts as in-court restraints and determined that trial courts should apply the same principles and procedures used in the decision to employ shackles. Mobley, 397 S.W.3d at 101. As the court explained:

> To that end, we reiterate that there is a legal presumption against the use of in-court restraints. Willocks v. State, [546 S.W.2d 819, 821 (Tenn. 1976)]. To justify the use of restraints, the State bears the burden of demonstrating necessity that serves a legitimate interest, such as preventing escape, protecting those present in the courtroom, or maintaining order during trial. State v. Thompson, [832 S.W.2d 577, 580 (Tenn. Crim. App. 1991)]; Willocks v. State, 546 S.W.2d at 820. The trial court should consider all relevant circumstances, including without limitation: (1) the defendant's circumstances, such as record of past behavior, temperament, and the desperateness of his or her situation; (2) the state of the courtroom and courthouse; (3) the defendant's physical condition; and (4) whether there is a less onerous but adequate means of providing security. Lakin v. Stine, 431 F.3d 959, 964 (6th Cir. 2005); Kennedy v. Cardwell, [487 F.2d 101, 110-11 (6th Cir. 1973)]. The trial court should consider the relevant circumstances against the backdrop of affording the defendant the physical indicia of innocence, ensuring the defendant's ability to communicate with counsel, protecting the defendant's ability to participate in his or her defense and offer testimony in his or her own behalf, and maintaining a dignified judicial process. See Deck v. Missouri, [544 U.S. 622, 630-32 (2005)].
>
> The trial court must make particularized findings, and the better practice is to hold a hearing on the issue so that factual disputes may be resolved and evidence surrounding the decision may be adduced and made part of the record. Willocks v. State, 546 S.W.2d at 822. Only in this way will the record allow for meaningful appellate review. Of course, the decision to require the use of a stun belt is addressed to the sound discretion of the trial court. State v. Thompson, 832 S.W.2d at 580. As a final note, we point out that should a stun belt inadvertently become visible to the jury, the trial court should give cautionary instructions that it should in no way affect the jury's determinations. See Willocks v. State, 546 S.W.2d at 822.

Id.

Turning to the instant case, the trial court properly applied the principles espoused in Mobley. On the day the Appellant's trial was supposed to begin, the trial court noted that it was required to employ the least drastic security measures and consider whether the stun belt was necessary to maintain a dignified judicial process. The trial court found that

the Appellant's behavior that morning demonstrated the stun belt was needed to maintain a dignified judicial process. We do not think the trial court abused its discretion. The Appellant was belligerent to the trial court and to second trial counsel. After the Appellant was removed from the courtroom, he continued to use profanity within the hearing of everyone in the courtroom and was observed "walking in circles" in the holding cell. Despite the Appellant's disruptive and disturbing behavior, the trial court delayed ordering that he wear a stun belt. Instead, the trial court reset the Appellant's trial and ordered that he undergo a psychological evaluation to determine if medication was warranted, which could prevent the need for the stun belt. Apparently, though, medication was not prescribed to the Appellant. Nevertheless, on the first day of trial, the trial court gave the Appellant an opportunity to proceed without the use of any restraints. However, the Appellant continued to be belligerent and combative. In our view, the trial court ensured that the stun belt was the least drastic security measure and that the stun belt was necessary to maintain a dignified judicial process.

As to the Appellant's claim that his being shocked with the stun belt warranted a mistrial, the Appellant and the State assert that no cases in Tennessee have addressed this issue. We too have been unable to find any Tennessee authority that has addressed a defendant's being shocked by an electronic restraint in the courtroom. Looking outside this jurisdiction, the Appellant likens his case to Morris v. State, 554 S.W.3d 98 (Tex. Ct. App. 2018). In Morris, on the first day of trial after the prosecutor read the indictment, the trial court asked for the defendant's plea of guilty or not guilty. 554 S.W.3d at 103. Instead of stating his plea, the defendant, who was wearing a stun belt attached to his leg, stated that he had "the right to make a defense," that he had a lawsuit pending against his attorney, and that he had asked the trial judge to recuse himself from the defendant's case. Id. The trial court had the jury removed from the courtroom and warned the defendant about any further outbursts. Id. The defendant continued with his objections, so the trial court ordered that the bailiff activate the stun belt. Id. at 103-04. After the first shock, the trial court asked the defendant twice if he was going to behave. Id. at 104. The defendant responded that he was an "MHMR client" and had a history of mental illness, so the trial court ordered that he be shocked again. Id. After the second shock, the trial court asked the defendant several times if he was going to behave. See id. at 104. The defendant "continued to speak about other matters," so the trial court had him shocked a third time. Id. at 104. After the third shock, the defendant was removed from the courtroom, and the trial court "made findings that the defendant breached decorum and explained that the court's actions were intended to remedy that breach." Id. at 105.

On appeal, the defendant claimed that the trial court violated his constitutional rights by repeatedly shocking him with the stun belt. Id. at 103. The court of appeals agreed with the defendant, concluding that "decorum concerns alone are not enough to justify shocking a defendant multiple times, even outside the presence of the jury." Id. at 112. The court

went on to hold that stun belts could be activated "only in extraordinary circumstances when immediate security concerns or flight risk justify use." Id. at 118.

We think the facts of the present case are quite distinguishable from Morris. Significantly, unlike the defendant in Morris, the Appellant exhibited volatile behavior before and during the trial that indicated he posed a security risk. On August 14, 2017, the Appellant was unable to calm down after he was removed from the courtroom. He was observed walking in circles and continued shouting profanity. When the trial court again ordered that the Appellant be removed from the courtroom on the first day of trial, the Appellant warned sheriff's deputies not to put their hands on him. Moreover, the Appellant was shocked only after he refused two direct orders from the court officer to sit down. Although the trial court determined that the Appellant stood and refused to sit down out of respect for the his elderly relative, the trial court was not able to make that determination until after the Appellant had been shocked.

In U.S. v. Cunningham, 194 Fed. Appx. 582, 585 (11th Cir. 2006), the defendant had an outburst that caused security staff to activate his stun belt and "'tackle'" him to the floor in front of the jury. On appeal, the defendant claimed that the trial court erred by not declaring a mistrial because the jury had been unfairly prejudiced. Cunningham, 194 Fed. Appx. at 585. The Eleventh Circuit concluded, though, that the trial court did not abuse its discretion by failing to declare a mistrial. Id. First, the appellate court stated that "it is well established that a defendant generally may not benefit through his own misconduct." Id. Moreover, the court found that there was no indication the jury was prejudiced by the outburst, noting that the trial court polled the jurors twice and that none of them indicated the incident had affected their ability to consider the case fairly and impartially. Id. Finally, the court reiterated that even if the jury was prejudiced by the incident, the defendant could not require a mistrial through his own misconduct. Id.

As in the Eleventh Circuit, "[i]t has long been settled in Tennessee that a party cannot take advantage of errors which he himself committed or invited, or induced the trial court to commit, or which were the natural consequence of his own neglect or misconduct." State v. Garland, 617 S.W.2d 176, 186 (Tenn. Crim. App. 1981). Additionally, although the trial court did not poll the jurors, the trial court did not observe any emotional response from the jurors and instructed them to disregard what they had seen. We note that during oral arguments, appellate counsel contended that the trial transcript and the transcript for the motion for new trial hearing indicated that the shock "knocked [the Appellant] down." However, the trial record does not reflect what physical effect, if any, the shock had on the Appellant. Therefore, we do not know what the jury observed. In any event, we generally presume that the jury follows the instructions of the trial court. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994); Tenn. R. App. P. 36(b). Accordingly, we conclude that the trial court did not err by denying the Appellant's request for a mistrial.

- 14 -

## B.  Batson Challenge

Next, the Appellant, who is African-American, claims that the trial court erred by allowing the State to use a peremptory challenge to strike the only African-American from the jury venire in violation of Batson v. Kentucky, 476 U.S. 79 (1986).  In a related argument, the Appellant contends that the racial composition of the jury venire and the petit jury failed to reflect the racial composition of the community.  The State argues that the trial court did not err by denying the Appellant's request for a mistrial because the State provided a race-neutral explanation for striking the juror and because the totality of the circumstances indicated that the State's race-neutral explanation was not pretextual.  The State also argues that the Appellant waived any issue regarding the racial composition of the jury venire or the petit jury.  We agree with the State.

During jury selection, the State used a peremptory challenge to strike Juror Number 12, and the trial court immediately asked third trial counsel if she was "raising the Batson issue."  Third trial counsel said yes, and the prosecutor responded that Juror Number 12 "works for East Tennessee Children's Hospital.  Because she is an advocate for a child, the defendant's age concerns the State."  Third trial counsel stated that she did not think "that's a sufficiently neutral reason" and that Juror Number 12 was "the only African-American on the entire venire."  Both the prosecutor and the trial court noted that another potential African-American juror was in the courtroom.  The trial court asked if the State was striking Juror Number 12 because she was a nurse, and the prosecutor responded that "she's a child life specialist with East Tennessee Children's Hospital.  Because of the defendant, who is young, we believe she would be sympathetic towards the defendant."  The trial court accepted the prosecutor's race-neutral reason, saying, "I'll have to agree, that her circumstances indicate a predisposition of favoritism toward the children, because of his age or her line of work."

In Batson, the United States Supreme Court held that the prosecutor's use of peremptory challenges to intentionally exclude jurors of the defendant's race violated his right to equal protection under the Fourteenth Amendment to the U.S. Constitution.  476 U.S. at 89.  To invoke Batson protections, a defendant must establish a prima facie case that a juror is being challenged on the basis of race or gender.  See id. at 94.  A defendant can establish a prima facie case simply by demonstrating that the State excluded members of a cognizable racial group from the jury pool.  State v. Echols, 382 S.W.3d 266, 281 (Tenn. 2012).

Once the defendant has presented a prima facie case of purposeful discrimination, the State must give a race-neutral reason for the challenge.  Id.  The State's race-neutral reason "must be a clear and reasonably specific account of the prosecutor's legitimate

reasons for exercising the challenge . . . [but] need not be persuasive, or even plausible." State v. Hugueley, 185 S.W.3d 356, 368 (Tenn. 2006) (citing Batson, 476 U.S. at 97; Purkett v. Elem, 514 U.S. 745, 767-68 (1995)). "If a race-neutral explanation is provided, the trial court must then determine, from all of the circumstances, whether the defendant has established purposeful discrimination." Hugueley, 185 S.W.3d at 368 (citing Batson, 476 U.S. at 98). "The trial court may not simply accept a proffered race-neutral reason at face value but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual." Id. (citing Miller-El v. Dretke, 545 U.S. 231 (2005)).

As this court has explained,

"[D]etermination of the prosecutor's discriminatory intent or lack thereof turns largely on the evaluation of the prosecutor's credibility, of which the attorney's demeanor is often the best evidence." State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994). The United States Supreme Court has recognized that a defendant may present a variety of evidence to support a claim that a prosecutor's peremptory strikes were made on the basis of race, including: (1) statistical evidence comparing the prosecutor's use of peremptory strikes against African-American jurors and Caucasian jurors in the case; (2) the prosecutor's disparate questioning of African-American and Caucasian jurors in the case; (3) "side-by-side comparisons" of African-American jurors who were struck and Caucasian jurors who were not challenged; (4) the "prosecutor's misrepresentations of the record when defending the strikes during the Batson hearing; (5) relevant history of the State's use of peremptory strikes in past cases; or (6) any other relevant circumstances bearing upon the issue. Flowers v. Miss., 139 S. Ct. 2228, 2243 (2019). "When a prosecutor misstates the record in explaining a strike, that misstatement can be another clue showing discriminatory intent." Id. at 2250. A prosecution's shifting of reasons for the strike also suggests that the reasons may be pretextual. Frost v. Chatman, 136 S. Ct. 1737, 1751 (2016).

State v. Precious Briana Horton, No. M2019-00826-CCA-R3-CD, 2020 WL 3267209, at *5 (Tenn. Crim. App. at Nashville, June 17, 2020), perm. app. denied, (Tenn. Oct. 7, 2020).

Our supreme court has emphasized that under Batson, a trial court "'must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination.'" Hugueley, 185 S.W.3d at 369 (quoting Woodson v. Porter Brown Limestone Co., 916 S.W.2d 896, 906 (Tenn 1996)). The party objecting to the peremptory challenge bears the ultimate burden of establishing purposeful discrimination. Id. at 374 (citing Batson, 476 U.S. at 93).

- 16 -

Initially, we agree with the State that the Appellant has waived any issue that African-Americans were not fairly and reasonably represented in the jury venire or on the petit jury because he raises the issue for the first time on appeal. See State v. Tyran Rollins, No. W2019-00192-CCA-R3-CD, 2020 WL 1231711, at *5 (Tenn. Crim. App. at Jackson, Mar. 12, 2020). As to the Appellant's Batson claim, third trial counsel objected after the prosecutor challenged Juror Number 12. In response, the trial court asked third trial counsel if she was "raising the Batson issue," implicitly ruling that the Appellant made the requisite prima facie showing of discrimination. The prosecutor explained the challenge by stating that the juror worked as a child life specialist for East Tennessee Children's Hospital and that her employment as an advocate for children would make her sympathetic to the Appellant, who was young. The trial court was satisfied that the prosecutor offered a race-neutral explanation for the challenge and implicitly found that the totality of the circumstances did not support a finding of purposeful discrimination, noting that an African-American male was still present in the venire. At the hearing on the Appellant's motion for new trial, the State noted that Juror Number 12 was replaced with that African-American juror and that "there were still more African-Americans left in the jury pool."

We do not think that the Appellant has met his burden of establishing purposeful discrimination. At the time of the robbery, the Appellant was nineteen years old and the father of a baby girl. We have carefully reviewed the transcript of jury selection and have been unable to discern any disparate treatment based on race. Accordingly, we conclude that the trial court did not err by ruling that under the totality of the circumstances, the Appellant failed to establish purposeful discrimination.

### C. Flight Instruction

The Appellant contends that the trial court erred by instructing the jury on flight. He claims that the proof "did not necessarily warrant such an instruction" and that the instruction was prejudicial because it raised the issue of a consciousness of guilt. The State argues that the trial court properly instructed the jury. We agree with the State.

During trial, the trial court asked if either party wanted to request a special jury instruction, and the State requested an instruction on flight. Third trial counsel objected to a flight instruction because "[t]he evidence was, he was being shot at, Your Honor." The State responded, "He ran." The trial court stated that the proof supported the instruction.

In the final jury charge, the trial court provided the following instruction on flight:

> The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of

- 17 -

guilt. Flight is the voluntary withdrawal of one's self for the purpose of evading arrest or prosecution for the crime charged.

Whether the evidence presented proves, beyond a reasonable doubt, that the defendant fled is a question for your determination. The law makes no precise distinction as to the manner or method of flight. It may be open or it may be a hurried and -- or concealed departure or it may be a concealment within the jurisdiction. However, it takes both a leaving of a -- it takes both a leaving the scene of the difficulty and a subsequent hiding out[,] evasion[,] or concealment in the community or a leaving the community for parts unknown, to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant.

On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered or by the facts and circumstances of the case. Whether there was flight by the defendant, the reasons for it and the weight to be given to it are questions for you to determine.

See Tenn. Prac. Pattern Jury Instr. T.P.I.--Crim. 42.18 (16th ed.).

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998).

"In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." State v. Berry, 141 S.W.3d 549, 588 (Tenn. 2004). There is sufficient evidence to support a jury charge on flight where there is proof of "'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown.'" State v. Burns, 979 S.W.2d 279, 289-90 (Tenn. 1998) (emphasis omitted) (quoting State v. Payton, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989)). The State can satisfy the subsequent hiding out, evasion, or concealment requirement by introducing evidence from which a jury might infer such action. See State v. Terrance Wilks, No.

W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim. App. at Jackson, Nov. 22, 1999). "Any contradictory evidence that serves to rebut the state's proof merely raises a question for the jury to resolve." Id. This court has explained that:

> "The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight."

State v. Whittenmeir, 725 S.W.2d 686, 688 (Tenn. Crim. App. 1986) (quoting Rogers v. State, 455 S.W.2d 182, 187 (Tenn. Crim. App. 1970)).

Turning to the present case, we note that the trial court did not state on the record what proof supported the flight instruction. Regardless, the victim testified that the robber fled from the Kenjo Market after she was unable to open the safe, and the store's surveillance video showed a person wearing clothing identical to that of the Appellant running out of the store. The Appellant then used a false identification to rent room 113 at the Red Roof Inn. At some point, a shooting occurred at the motel, and a woman inside room 113 telephoned the police. A police officer went to the nearby Kroger and observed the Appellant, who fled on foot from the officer. The officer tased the Appellant and arrested him. There was ample evidence that the Appellant robbed and fled from the Kenjo, that he subsequently used a false name to rent a motel room, and that he fled from the police at the Kroger in order to evade arrest for the robbery. Therefore, we conclude that the trial court properly instructed the jury on flight.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 19 -